*373 OPINION OF THE COURT
Chief Judge Cooke.
When a child-care agency has custody of a child and brings a proceeding to terminate parental rights on the ground of permanent neglect, it must affirmatively plead in detail and prove by clear and convincing evidence that it has fulfilled its statutory duty to exercise diligent efforts to strengthen the parent-child relationship and to reunite the family. Only when this duty has been deemed satisfied may a court consider and determine whether the parent has fulfilled his or her duties to maintain contact with and plan for the future of the child. In the instant proceeding, the petitioning agency presented nothing to establish that it had fulfilled its duty with respect to the subject child’s natural father. Consequently, the Family Court properly dismissed the petition insofar as it alleged that the child had been permanently neglected by her father.
_L
Sheila G. was born out of wedlock on August 29, 1977. Soon after her birth, she was placed voluntarily by her mother with the Department of Social Services for the City of New York. The department, in turn, authorized its agent, the Orphan Asylum Society of the City of Brooklyn, commonly known as the Brookwood Child Care Agency, to supervise the child’s care. Sheila was placed in a foster home on September 29, 1977.
On November 7, 1977, Sheila’s natural father, Dennis H., telephoned the Brookwood agency. He acknowledged paternity and requested a meeting with agency officials, which was held two weeks later. At that time, Dennis expressed his desire to visit and financially support the child.
Representatives of Brookwood informed Dennis that the mother had adamantly refused to permit Dennis access to the child. Dennis was instructed that, until such time as he formally established paternity, the agency would be bound by the mother’s instructions and he would not be allowed to see Sheila. Brookwood provided Dennis with the name and the address of the Kings County Family Court.
Over the course of the next year, Dennis regularly contacted Brookwood, inquired about Sheila’s well-being, and *374 related his progress in establishing paternity. Dennis reported a number of visits he had made to the Family Court and discussions he had had with clerks and with a Judge. He also stated that he had been informed that the matter could go no further unless Sheila’s mother participated in the process. The mother’s failure to co-operate was cited by Dennis in explaining why he had been unable to establish paternity.
During this period, Brookwood’s efforts centered on working with Sheila’s mother toward reuniting the two. The mother’s disinterest and her inability to appropriately care for the child or plan for the child’s future soon became apparent to Brookwood. Consequently, it was determined in early 1978 that the agency plan would be to seek a surrender of Sheila for adoption and to place the child in a preadoptive home. In the event that a voluntary surrender by the natural parents was not forthcoming, Brookwood decided that it would initiate a proceeding to terminate the rights of the mother and father.
Sheila was placed in her current foster home in October, 1978, when she was 13 months old. Her foster parents were, at that time, informed by the Brookwood caseworker that the father’s whereabouts were unknown and that Sheila would be available for adoption within six months’ time.
The next month, the mother had a “change of heart” and decided that Dennis should be permitted access to the child. A biweekly visitation schedule was established by which Dennis, his mother, and his sister would visit Sheila at Brookwood’s offices. For the next year and a half, until the instant proceeding was brought, Dennis and his family regularly attended the scheduled visits.
In January, 1979, Dennis came forward with a plan to take custody of Sheila. Dennis, an employee of the Post Office, had adequate income to support himself and Sheila. At that time, however, he lived at a YMCA. Dennis proposed to the Brookwood caseworker that he would move in with his mother who would take care of the child until he returned from work each day. Dennis reiterated this plan to the caseworker in April, 1979.
*375 In July, 1979, Dennis formally established paternity. He then suggested a new plan for taking custody of his daughter. Under this plan, Dennis stated that he preferred independence from his mother and that, rather than moving to his mother’s home, he would find his own apartment. Sheila would be placed in a day-care center while the father was at work. Dennis reiterated this plan in October, 1979 and January, 1980.
This proceeding was commenced in May, 1980. Brookwood brought a petition in Family Court against both of the natural parents for a determination that Sheila was a permanently neglected child, that both parent’s rights be terminated, and that Sheila be made available for adoption (see Family Ct Act, § 614, subd 1; Social Services Law, § 384-b, subd 7, par [a]). The matter was set down for a fact-finding hearing (see Family Ct Act, § 622).
Evidence relating to the allegations against the natural mother was presented at many scheduled hearings held during the latter part of 1980 and the early months of 1981. At the close of the fact-finding hearing, the Family Court found that Sheila had been permanently neglected by her mother. That determination was not appealed to the Appellate Division and is not at issue in this appeal.
The allegations against the natural father were the subject of hearings held on February 18-19, 1981. “The essence of the agency’s case” against Dennis, in the words of Brookwood’s attorney, was “the failure to plan. Not lack of visitation, but failure to plan.” The agency argued that it had, under the circumstances, made a reasonable effort in assisting Dennis. It was noted that the agency repeatedly informed Dennis that he would have to establish paternity and that it had provided Dennis with the name and address of the court in which he could receive an order of filiation. Also cited were two incidents, one in April, 1979, when the agency had offered Dennis counseling, and a second in February, 1980, when Dennis had been offered assistance in finding an apartment. Relying on these efforts and the assertion that Dennis was a well-intentioned and intelligent individual, the agency argued that it nevertheless took Dennis 18 months, from the time of Sheila’s birth, to establish paternity. In the agency’s view, this constituted *376 evidence of a failure to plan for Sheila’s future sufficient to give rise to a determination of permanent neglect.
At the close of the fact-finding hearing, the guardian ad litem for Sheila argued that Dennis’s parental rights should not be terminated. It was noted that, promptly after Sheila’s birth, Dennis had informed Brookwood that he was the child’s father and had since undertaken his own efforts to establish paternity. The guardian also asserted that a finding of a failure to plan should not rest on Dennis’s failure to establish paternity. To this end, it was pointed out that the “morass of coming to court * * * and getting orders of filiation, getting summons [is] something * * * that many attorneys, many attorneys that I have been familiar with, have difficulty with, let alone a lay person.”
In a decision from the Bench on February 19, 1981, the Family Court dismissed the petition brought against Dennis and later explained the reasons for dismissal. The court held that Brookwood failed to exercise diligent efforts on behalf of uniting Sheila and Dennis. It found that “vis-avis Dennis * * * Brookwood did not assess him and his family as a parent and family to whom Sheila could be released. Brookwood did not. identify specific problems preventing discharge of Sheila to [Dennis’s] family, nor plan for provision of services to resolve or ameliorate the identified problems.” The court added that it could not “reconcile with Brookwood’s statutory duty * * * [the] ignoring and rejection of Dennis and his family, as an alternative to the mother, in light of [their] persistent presence, strengths, interest, potential, and natural and legal rights.” Dennis on the other hand, was found to have been “consistent, persistent, and diligent in his contacts, efforts, and expressions of interest with regard to Sheila.”
A cross motion for custody had been made by Dennis, and the court ordered that, in light of this motion and the fact that the petition against Sheila’s mother had been sustained and her parental rights had been terminated, a dispositional hearing (see Family Ct Act, § 623) and custody hearing should be held simultaneously. The foster parents were granted their motion to intervene in the proceedings (see Social Services Law, § 383, subd 3).
*377 Over the course of the next year, hearings were held on the question of custody. Principally, Sheila’s emotional well-being was called into issue. Offered in evidence was the testimony and written reports of a child psychologist employed by Brookwood, a psychiatric consultant to Brookwood, a psychiatrist retained by the Family Court, and a psychiatric social worker retained by the foster parents to prepare a report and to testify in court. All concurred, that in recent months the relationship between Sheila and Dennis and Dennis’s family had deteriorated. The experts related that the girl had developed a strong attachment to her foster parents and that she suffered from acute “separation anxiety disorder.” The prognosis was that an immediate change in custody would cause extreme and, perhaps, irreparable psychological damage to Sheila. It was recommended that she remain in the custody of her foster parents and that she receive psychiatric therapy, special education, and extensive case-work supervision.
Also challenged at the hearing was Dennis’s fitness to assume custody. Dennis testified that he had had problems in the past with alcohol and heroin but he asserted that he was successfully coping with these problems. It was noted that he had been a regular participant in the drug counseling service at work and had voluntarily admitted himself to a hospital for alcohol detoxification.
By an order dated March 11, 1982, the Family Court granted Dennis’s cross petition for custody, but held that the circumstances dictated that the transfer of custody not be immediate. Recognizing “the presence of a compelling reason to except from a natural parent’s long established right, in order to protect the child * * * against possible psychological or emotional harm”, the court found that Sheila “suffers from a ‘separation anxiety disorder’, a pathology suffered by children who have an abnormal fear of separation from their ‘family’.” Consequently, Sheila was ordered to be placed in the continuing custody of the Department of Social Services for an additional one-year period. The department was instructed to formulate a plan that included appropriate counseling, visitation, and supervision “to effectuate the unification of Sheila with her natural father and family, as soon as is feasible, during the course of this placement period.”
*378 The court also commented on the evidence relating to Dennis’s history of alcohol and heroin abuse. It found that the evidence on this issue consisted “entirely of [Dennis’s] own voluntary efforts to deal with his own problems” and that “[t]here is no evidence that [Dennis’s] ability to maintain and function on his job, or otherwise perform as a parent was or is impaired by his problems. The evidence does* not establish that Dennis * * * was or is a drug addict, or that he is unfit.” Nevertheless, the department was ordered to monitor Dennis and to report any evidence of drug dependency to the court every three months.
Finally, the court found that Brookwood had undermined the potential relationship of Dennis and Sheila by, among other things, disingenuously reporting to the foster parents at the outset of the placement that the child would soon become available for adoption,[1] and thereafter demonstrating indifference toward Dennis and his family while encouraging Sheila’s relationship with her foster parents. The court found it necessary to order substitution of Brookwood “with an authorized agency committed to diligently and in good faith implementing” the order of the court.
The department charged the Sheltering Arms Children’s Service with responsibility for developing, implementing, and supervising a plan for Sheila’s unification with Dennis and his family. The plan was submitted to the court on August 5, 1982 and adopted by the court by an order 20 days later. It projected transfer of Sheila’s custody to Dennis and his family by September 25, 1982.
The foster parents appealed from the Family Court orders that dismissed the petition to terminate Dennis’s rights, granted Dennis’s cross petition for custody and approved the plan for reunification. The Appellate Division granted a stay of the transfer of custody pending *379 determination of the appeal, but denied a requested stay of visitation by Dennis.[2]
The Appellate Division modified by holding that the child had been permanently neglected by both of her natural parents. The court determined that Brookwood had satisfied its statutory duty to exercise diligent efforts, finding that the girl had not been placed in her preadoptive home until she had been in the agency’s custody for more than one year. The court also noted that “[t]his is not a case where the agency blocked or interfered with the return of the child to the natural parent.” (94 AD2d, at p 733.)
The court held that, in any event, “[t]he agency’s responsibility should not be considered, in vacuo, without considering the parent’s primary responsibility to assume his own obligations when he is financially and physically able to do so.” (94 AD2d, at p 733.) It found that although Dennis was possessed of sufficient financial means to support Sheila, he had never done so and had not presented a feasible plan for taking custody of her until one and one-half years after her birth. This conduct was held to constitute a breach by Dennis of his responsibility to plan for Sheila’s future, giving rise to a determination of permanent neglect, and was not excused by Dennis’s apparent interest in the child. The court vacated the orders of the Family Court, adjudicated Sheila as permanently neglected by Dennis as well, denied Dennis any visitation rights and placed Sheila under the continuing supervision of the Sheltering Arms Children’s Service without prejudice to an application by the foster parents for adoption of Sheila.
Dennis appealed. He argues in this court that prior to the institution of this proceeding, Brookwood had not exer *380 cised diligent efforts in fostering his relationship with Sheila and that this failure precludes a determination of permanent neglect. Sheila’s foster parents, respondents here, argue that Brookwood had exercised diligent efforts and that the efforts of a child-care agency only need be commensurate with and responsive to the efforts undertaken by the parent to retain his or her child.
This court now reverses.
II
The legal standard for “permanent neglect” as a basis for terminating a parent’s right to a child, is codified at subdivision 7 of section 384-b of the Social Services Law. That statute provides, in relevant part, that a “ ‘permanently neglected child’ shall mean a child who is in the care of an authorized agency and whose parent or custodian has failed for a period of more than one year following the date such child came into the care of an authorized agency substantially and continuously or repeatedly to maintain contact with or plan for the future of the child, although physically and financially able to do so, notwithstanding the agency’s diligent efforts to encourage and strengthen the parental relationship when such efforts will not be detrimental to the best interests of the child.”[3]
The questions — whether a parent has maintained contact with the child and adequately planned for the child’s future, and whether a child-care agency has exercised diligent efforts to encourage and strengthen the parental relationship — may appear to be discrete and independent. The foster parents suggest, and the court below held, that an agency’s efforts should be measured only with reference to the ability of the parent to help himself or herself. This court holds that for both practical and policy reasons, it is the agency’s statutory duty that is demonstrably paramount and pervasive. When an authorized child-care *381 agency has brought a proceeding to terminate parental rights, on the ground of permanent neglect, the court must evaluate as a threshold matter whether the agency has exercised diligent efforts to encourage and strengthen the parental relationship.
A
The Temporary State Commission on Child Welfare, whose report “Barriers to the Freeing of Children for Adoption” (1976 Report), and draft legislation were adopted by the Legislature when revamping statutes relating to termination of parental rights (see L 1976, ch 666), acknowledged the interrelationship between an agency’s ability and duty to assist the parent in strengthening the parent-child relationship and the parents’ ability to plan for the child’s future. The commission noted that, to enable a child to return to his or her family, an agency must have “the capability to diagnose the problems of the parent and of the child; access to a host of concrete supportive and rehabilitative services; cooperation with community treatment programs (such as health, alcohol, and drug treatment); and a casework staff that can motivate the parents to avail themselves of services” (1976 Report, at p 100). Lower courts have recognized that an agency is in a superior position to the parent with respect to the planning factor. “The parties are by no means dealing on an equal basis. The parent is by definition saddled with problems: economic, physical, sociological, psychiatric, or any combination thereof. The agency, in contrast is vested with expertise, experience, capital, manpower and prestige. Agency efforts correlative to their superiority [are] obligatory” (Matter of Sydney, 84 Misc 2d 932, 934; accord Matter of Anita “PP”, 65 AD2d 18, 22; Matter of Suzanne N. Y., 102 Misc 2d 215, 218; Matter of Joyce Ann R, 82 Misc 2d 730, 733).
The corollary to the agency’s dominant position is that indifference by the agency may greatly serve to impede a parent’s attempts at reunification. The temporary commission noted that agency indifference was prevalent, when it found:
“A majority of Family Court judges across the State believe that agencies do not make permanent plans for *382 children in foster care, nor try sufficiently to reunite the parent and child. They cite: the failure of agencies to encourage and cooperate in parental visitation; agency failure to assist parents with their problems; the cultural and socio-economic differences between middle-class social workers and under-privileged parents; the bias of some workers against the parents; the conviction of some caseworkers that the interests of children are better served in foster care than in their parents’ home. A few judges reason that the agencies have been given an overwhelming task and insufficient resources to deal with it.
“Some judges allege that agencies deliberately or heedlessly subvert visitation and the restoration of the family. First, they believe some children are placed with foster parents of different values from, and often with antipathy to, those of the natural parents. Second, children are often placed in areas that are inaccessible to their natural parents. In the counties outside New York City, the parents are frequently dependent on the agency for transportation, which is irregularly provided” (1976 Report, at pp 90-91).[4]
Moreover, “[rjesearchers have also found that parents who perceive their child care agency as unhelpful and as opposing their reunification with their child are less frequent visitors and are less likely ever to regain custody” (Garrison, Why Terminate Parental Rights?, 35 Stan L Rev 423, 483). It is evident, therefore, that the efforts undertaken by an agency on behalf of the parents may have a profound practical effect on what later may be viewed as the success or failure of the parents’ efforts to plan for the future of the child.
*383 Of course, transcending the practical reasons for providing a threshold requirement that an agency exercise diligent efforts toward reuniting parent and child is the strong public policy that before the State may terminate parents’ rights it must first attempt to strengthen familial ties (see Matter of Leon RR, 48 NY2d 117, 126). The temporary commission’s stated purpose was to review statutes governing foster care and termination of parental rights with a view towards removing obstacles inhibiting the permanent placement of children (see 1976 Report, at pp i-iv). The commission found that “[t]he prevailing view among judges and agencies is that the diligent effort requirement should be maintained” (id,, at p 23). It noted, however, that “[i]t is the view of a small minority that this requirement should be eliminated because it is a stumbling block to freeing the child, thereby penalizing him. This minority viewpoint maintains that the diligent effort requirement focuses on what the agency has done rather than on the child’s needs” (id., at p 24). Notwithstanding its over-all goal and this dissenting viewpoint, the commission recommended “retention of the diligent effort requirement reflecting a sound societal value in addition to considerations of fundamental equity, if not constitutional rights, that the State should exercise reasonable efforts to restore familial relationships before seeking to terminate them” (id., at p 25 [emphasis in original]).
The Legislature, in enacting section 384-b of the Social Services Law, went further on this issue than did the temporary commission’s original proposed statement of legislative findings and intent. Added to the legislation, when enacted, was the specific statement of intent that “the state’s first obligation is to help the family with services to prevent its break-up or to reunite it if the child has already left home” (Social Services Law, § 384-b, subd 1, par [a], cl [iii]).[5]
*384 Consistent with this legislative intent, the threshold nature of the diligent-efforts requirement is evinced by the language of the statutes defining “permanent neglect” and governing the procedure for an adjudication of permanent neglect. Subdivision 7 of section 384-b of the Social Services Law defines permanent neglect as a failure by the parent to maintain contact with or to adequately plan for the child “notwithstanding” diligent efforts undertaken by the agency. Similarly, under section 614 of the Family Court Act an agency’s petition initiating a proceeding for termination of parental rights based on permanent neglect must first allege in detail the agency’s efforts to strengthen the parent-child relationship. Only then may it assert that the parent has failed in maintaining contact with the child or has failed to adequately plan for the child’s future.
The Legislature also added guidelines to measure whether the agency has complied with its duty to exercise diligent efforts. These guidelines provide that “ ‘diligent efforts’ shall mean reasonable attempts by an authorized agency to assist, develop and encourage a meaningful relationship between the parent and child, including but not limited to: (1) consultation and cooperation with the parents in developing a plan for appropriate services to the child and his family; (2) making suitable arrangements for the parents to visit the child * * * (3) provision of services and other assistance to the parents * * * so that problems preventing the discharge of the child from care may be resolved or ameliorated; [and] (4) informing the parents at appropriate intervals of the child’s progress, development and health” (Social Services Law, § 384-b, subd 7, par [f]).
Thus, when an agency has assisted a parent through meaningful efforts to provide counseling with respect to a problem (psychological, physiological, financial, and the like) that impedes the return of the child, to assist in the planning for the child’s future, to aid in the procurement of housing or employment, and to schedule regular and meaningful visits with the child, it will be found that the agency has satisfied its statutory duty (see, e.g., Matter of Roderick W., 96 AD2d 746; Matter of Jamie Y., 92 AD2d 696; Matter of Janet AA., 88 AD2d 670; Matter of Lisa Ann U., 75 AD2d 944; Matter of Seith SS, 66 AD2d 914; cf. *385 Matter of Star A., 55 NY2d 560 [agency’s failure to direct parents to counseling constitutes breach of statutory duty]; Matter of Leon RR, 48 NY2d 117, supra [agency held to have breached duty by encouraging child’s relationship with foster parents while displaying hostility towards natural parents by unduly restricting visitation]; Matter of Thomas TT., 67 AD2d 788 [failure to give natural parents advice on how to gain custody of child held to violate statutory duty]; Matter of Anita “PP”, 65 AD2d 18, supra [advising parents that failure to plan will give rise to termination of their rights held not to constitute diligent efforts in absence of “viable suggestions” as to how the particular problem may be ameliorated]). An agency must always determine the particular problems facing a parent with respect to the return of his or her child and make affirmative, repeated, and meaningful efforts to assist the parent in overcoming these handicaps. In evaluating the over-all efforts undertaken by the agency, the courts should always refer to the statutory guidelines,
Of course, the agency is not charged with a guarantee that the parent succeed in overcoming his or her predicaments. Indeed, an agency that has embarked on a diligent course but faces an utterly un-co-operative or indifferent parent should nevertheless be deemed to have fulfilled its duty. The statute itself speaks of “reasonable attempts” to foster the parent-child relationship, and a diligent undertaking will serve to fulfill this requirement (see Social Services Law, § 384-b, subd 7, par [f]; see, also, Matter of Star A., 55 NY2d 560, 564, n 2, and at pp 566-567, supra [Meyer, J., dissenting]).
In sum, the Legislature has charged child-care agencies with a specific obligation to assist parents in regaining custody of children committed to foster care. It has recognized that the degree to which a parent has upheld his or her obligations to such children cannot be meaningfully measured when the agency itself has not undertaken diligent efforts on behalf of reuniting parent and child. It has declared as a matter of public policy that the State may not intervene to terminate a parent’s rights when assistance in strengthening the family has not been forthcoming. Therefore, proof by the child-care agency that it has satisfied its *386 statutory obligation is a threshold consideration and a necessary prerequisite to any determination of permanent neglect.
JB
The findings of the Family Court and the Appellate Division, with respect to Brookwood’s efforts undertaken in fostering a relationship between Dennis and Sheila and uniting the two, are in conflict. The Family Court found that Brookwood’s efforts were woefully inadequate. The Appellate Division found that, under the circumstances, Brookwood had satisfied its statutory duty. When there is a “disagreement between the courts below, this court reviews the record to determine which findings conform to the weight of the evidence” (Matter of Hime Y., 54 NY2d 282, 286). Upon review of the record, this court holds that the findings of the Family Court comport with the weight of the evidence.
It is noted that, in support of their contention on this appeal that Sheila was properly adjudicated by the Appellate Division as permanently neglected, the foster parents rely on evidence presented at the dispositional hearing which relates to Dennis’s fitness to be a parent and Sheila’s emotional problems. For two reasons, this evidence is irrelevant to the issue of permanent neglect. First, the evidence cited was presented after the proceeding held on the question of permanent neglect had terminated and the petition had been dismissed as against Dennis. The evidence relied on was presented at the dispositional hearings, at which a completely different standard of review is employed; namely, the best interest of the child. It was not offered by Brookwood in attempting to prove that Sheila had been permanently neglected by Dennis. Second, and more importantly, termination of parental rights may be based only on a specific ground provided for by statute; unlike a custody determination, parental rights may not be terminated solely because it is perceived to be in the best interest of the child (see Matter of Ricky Ralph M., 56 NY2d 77, 80; Matter of Sanjivini K., 47 NY2d 374, 382; Matter of Corey L v Martin L, 45 NY2d 383, 389-391). Therefore, only the evidence presented at the fact-finding *387 hearing, upon which the Family Court’s dismissal of the petition against Dennis was based, may be considered on this appeal.
The record is devoid of evidence that Brookwood engaged in “consultation and cooperation” with Dennis “in developing a plan for appropriate services” for Sheila and Dennis’s family (see Social Services Law, § 384-b, subd 7, par [f], cl [1]). During the child’s first year under Brookwood’s supervision, its “agency plan” called for no affirmative effort to contact Dennis. All contact between Dennis and Brookwood was due to Dennis’s efforts to apprise the agency of the progress he was making to establish paternity, and the only meeting with Dennis was scheduled at his request. Although Sheila’s mother was clearly indifferent towards and incapable of assuming custody, no steps were taken by Brookwood to review Dennis’s background or to determine what services would be necessary and appropriate in fostering a relationship between Dennis and Sheila. Indeed, within six months of the time Dennis initially contacted Brookwood, the agency had decided that its plan would be to terminate Dennis’s parental rights.
During the next 18 months, up to the time that the instant proceeding was commenced, Brookwood made no attempt to assist Dennis, who presented two separate plans, to gain custody of his daughter. When Dennis suggested, and later reiterated, his original plan to return to his mother’s home, the caseworker suggested only that Dennis give Sheila up for adoption. Indeed, at the hearing, Brookwood’s director conceded that the agency had done nothing to encourage a parental relationship and had offered Dennis no assistance in following through with this admittedly feasible plan. Dennis’s second plan was met with neither encouragement nor criticism. Again, the director admitted that no assistance was offered to Dennis in following through on this plan and that no alternatives were suggested.
Finally, Brookwood’s director of placement was asked at the hearing: “From what you just testified, and from the case record, would you say that [the caseworker’s] handling * * * of encouragement of the parental relationship *388 with [Dennis] was done according to good social work rules?” The director responded, “No.”
With respect to the question whether there was “provision of services and other assistance to the parents * * * so that problems preventing the discharge of the child from care may be resolved or ameliorated” (see Social Services Law, § 384-b, subd 7, par [f], cl [3]), the record indicates that no such effort was forthcoming from Brookwood. During Sheila’s first year of placement with Brookwood, the apparent problem preventing her discharge to Dennis was the absence of a formal adjudication of paternity. Brookwood did nothing more than to provide Dennis with the name and address of the Kings County Family Court. Notwithstanding Dennis’s repeated conversations with the agency, a year and a half passed before the caseworker explained to him that he did not necessarily need the mother’s co-operation to establish his paternity, that the court could do so in her absence. Less than three weeks later Dennis had established paternity. During the following 18 months, the agency continued this pattern of conduct. Although Dennis and his family regularly attended their scheduled visits with Sheila and Dennis had suggested two plans for taking custody, Brookwood identified no problem that prevented Sheila’s discharge to Dennis.
Brookwood also failed in its obligation to make “suitable arrangements for the parents to visit the child” (Social Services Law, § 384-b, subd 7, par [f], cl [2]). In light of the mother’s refusal to permit Dennis visitation and the absence of an adjudication of paternity, Brookwood may not be held solely responsible for not permitting Dennis visitation. Once permitted, however, Dennis’s visits with Sheila were scheduled for one hour every other week at 5:00 p.m. at Brookwood’s offices. Sheila’s caseworker was aware that Dennis worked until at least 5:00 p.m. and that for some visits, due to Dennis’s working late and travel time, he was only able to visit for a short time. Brookwood’s placement director noted that, during this period, Dennis’s relationship with Sheila had gone from a lack of friendship to one of friendship, but that the caseworker never recommended that the frequency of visitation be increased or the timing of visits be changed or lengthened. This was admitted to be a bad policy and contrary to good social work rules.
*389 Finally, for at least the first-year period, Brookwood made no effort in “informing the parents at appropriate intervals of the child’s progress, development and health” (Social Services Law, § 384-b, subd 7, par [f], cl [4]). As is noted above, Brookwood made no affirmative contact with Dennis during the first year. Dennis learned of Sheila’s well-being only through his own efforts.
In sum, the record indicates that Brookwood proceeded with utter indifference to Dennis’s rights. Brookwood failed to satisfy its statutory duty. This, in itself, precludes a finding of permanent neglect.
The foster parents suggest that, in view of Dennis’s admission of drug and alcohol abuse, Brookwood was not obligated to make diligent efforts, as such would have been contrary to Sheila’s best interest. This argument has no merit. Although an agency need not exercise diligent efforts when the efforts would be against the best interest of the child, Brookwood did not rely on this exception in its petition or at the fact-finding hearing. Indeed, the record indicates that, prior to the dispositional hearings, Brookwood had made no effort to learn of Dennis’s problems and at the fact-finding hearing the agency argued that it had exercised diligent efforts. Moreover, it is doubtful that suspected drug abuse by a parent would serve to entirely relieve an agency of its duty to exercise diligent efforts. This is precisely the type of problem that child-care agencies are designed to help ameliorate. The exception is not complete, and such an agency would be justified in relying on the exception only to the extent that, under the circumstances, a particular effort would be demonstrably contrary to the child’s best interest.
Ill
Once a child has been voluntarily placed with an authorized child-care agency, and is under foster care, the Family Court is vested with continuing jurisdiction over the child until there has been a final disposition of custody (see, generally, Social Services Law, § 392). A decision by that court to maintain the status quo or to return the child to his or her natural parent requires consideration of the child’s best interest (see Social Services Law, § 392, subd 7). In *390 view of this court’s decision that Sheila was improperly held to be permanently neglected by her natural father, it is necessary to remit this matter to the Family Court for a custody determination in Sheila’s best interest.
This court has had occasion to comment in a similar context that “it is doubtful whether it could be found to be in the child’s best interest to deny her [parent’s] persistent demands for custody simply because it took so long for her to obtain it legally” (Matter of Sanjivini K., 47 NY2d 374, 382, supra). We do not disavow that principle by remitting this matter to the Family Court. Rather, in view of the evidence offered concerning Sheila’s emotional well-being and unanswered questions concerning Dennis’s problems with drugs,[6] further review is both desirable and required. It may be that immediate transfer of custody would be manifestly improvident and that an indeterminate period of continued custody by Sheila’s foster parents is required. This should be left to the sound discretion of the Family Court.
We would only add that in the event Sheila’s custody is continued with her foster parents, Dennis, as in the case of all parents whose children have been placed in the foster care system, is entitled to affirmative, repeated, and meaningful assistance in gaining custody of his daughter, with supervision of the agency’s efforts by the Family Court.
Accordingly, the order of the Appellate Division should be reversed, without costs, and the matter remitted to Family Court, Kings County, for further proceedings in accordance with this opinion.

. The court noted that the foster parents had provided a stable and loving home and that it was Brookwood’s conduct that served to falsely raise their expectation of adoption. Notwithstanding this, the court also found that the foster parents had notice of Dennis’s efforts to gain custody of his daughter and that, “though motivated by an authentic desire to adopt a child to whom they could give their love, [they] persisted in the developing and nurturing of an inappropriate parent-child relationship with Sheila.” This was deemed a causative factor in Sheila’s development of a “separation anxiety disorder” and the court held that, being partially responsible for the problem, Sheila’s foster parents owed a duty of co-operation towards the uniting of Sheila and Dennis.

. Prior to the argument of that appeal, Sheila’s foster parents moved in Family Court to vacate its prior order and reopen the dispositional hearing or, in the alternative, stay the court’s order, on the ground of newly discovered evidence. The proffered evidence consisted of a hearsay statement that Dennis was reported to be attending a methadone maintenance clinic and was experiencing drug dependency, and an affidavit by Sheila’s foster mother stating that Sheila, upon her return from a visit at Dennis’s home, had reported that Dennis’s mother had “strapped” her and that strange people were occupying Dennis’s home. Also provided was a psychiatric report that indicated that permanent placement of Sheila away from her foster parents would have serious repercussions on Sheila’s emotional well-being. The court declined to vacate its prior orders but, due to the nature of the allegations, stayed its order of discharge pending a report by the Commissioner of Social Services.

. The practice analogue to this provision (Family Ct Act, § 614, subd 1, pars [c], [d]), sets forth that any petition for a determination of permanent neglect must allege, inter alia, that: (1) “the authorized agency has made diligent efforts to encourage and strengthen the parental relationship and specifying the efforts made or that such efforts would be detrimental” to the best interests of the child; and, that (2) “the parent or custodian, notwithstanding the agency’s efforts, had failed for a period of more than one year following the date such child came into the care of an authorized agency substantially and continuously or repeatedly to maintain contact with or plan for the future of the child although physically and financially able to do so”.

. One commentator recently concurred with this view, with support from regional and national surveys, stating that:
“Typically *** agencies do little to help parents regain custody of their children. The family problems that necessitated removal usually receive only perfunctory agency attention. In most cases, the agency caseworker contacts the natural parent infrequently and does not follow up referrals of the parent to other agencies * * * Contacts between agency and parent also tend to decrease markedly after the first year of placement, and services necessary to enable the child’s return home are rarely made available.
“Moreover, agencies often discourage parents from maintaining ties with their children. Agencies seldom involve natural parents in decision making regarding their children’s care. And they frequently frustrate parental contact with the child by, for example, placing children in locations which make parental visitation difficult, allowing visits only at agency offices under the eye of a social worker, and inflexibly restricting visiting hours” (Garrison, Why Terminate Parental Rights?, 35 Stan L Rev 423,428-429 [nn omitted]).

. In only two limited instances may an agency be deemed excused from its obligation to undertake diligent efforts to reunite parent and child. The first arises “when such efforts will * * * be detrimental to the best interest of the child” (Social Services Law, § 384-b, subd 7, par [a]). The second arises “when the parent has failed for a period of six months to keep the agency apprised of his or her location” (Social Services Law, § 384-b, subd 7, par [e]), although there is an indication that this exception will not apply when the agency could, without a “diligent search,” determine the parent’s location (see 1976 Report, at p 25).

. Although the Department of Social Services was directed by the Family Court in March, 1982 to monitor Dennis, it never complied with this order. Consequently, the degree, if any, of Dennis’s past or current drug dependence can in no way be determined by this record.