Matter of Allen T. (2005 NY Slip Op 51109(U))

[*1]

Matter of Allen T.

2005 NY Slip Op 51109(U)

Decided on May 26, 2005

Family Court, Kings County

Elkins, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on May 26, 2005

Family Court, Kings County
In The Matter of Allen T. and Noah T., children under the age of eighteen, alleged to be permanently neglected within the meaning of SSL § 384-b by A.T., Respondent
B 1851-2/04

Lee H. Elkins, J.
The instant petition alleges that the respondent has permanently neglected her children in foster care by "substantially and continuously or repeatedly [failing] to maintain contact with or plan for the future of the child[ren]...." [SSL § 384-b(7)(a)], during the period from October 2002 until February 2004. The children, Allen and Noah have been in foster care since July 31, 2001. The termination of parental rights petition was tried upon inquest, the mother having failed to appear.
Prequel
Based upon the court's findings in the underlying neglect, of which the court has taken judicial notice, the court finds as follows: The children's mother was not named in the original neglect petition [NN 04192/01]. The petition had been filed in February 2001, against an alleged person legally responsible, Edguardo Rivera, based upon his having fired a gun in the home in the presence of the children. Rivera was arrested. The petition against Rivera was withdrawn in April 2001, although he was subsequently convicted in criminal term. That petition was amended to include the mother, on April 11, 2001. The petition alleged alcohol use by the mother, as well as failure to protect the children. The children continued in the mother's custody. She first appeared before the court on April 26, 2001. The family was evicted from their home and the agency lost contact. The children were remanded to the Commissioner of ACS when it was determined that they had no place to live or means of support. The mother appeared in court again on August 28, 2001. She named the current foster father, a family friend, as a resource for the children. The court made a finding of neglect following an inquest as to the mother, on February 13, 2002. The basis of the finding was that the mother failed to take steps to protect the children from the alleged PLR who fired a gun in the home on two occasions. The mother was reportedly homeless. In February 2002, the court learned that the children had been in three foster homes since August 2001. The court was advised that both children were acting out aggressively. Allen was threatening to harm himself, hitting himself, banging his head on the floor and saying that no one wanted him. Noah bit the foster mother and drew blood. The agency scheduled psychological evaluations for both children. The court ordered a CSE evaluation for Noah and an early intervention evaluation for Allen. The agency certified the current foster home in March 2002, and the boys went to live with the current foster father. The mother appeared in court [*2]again on April 2, 2002. The court directed that she be permitted to visit in the current foster home in the presence of the foster father, on Saturdays.
At disposition of the neglect case on July 12, 2002, the court entered an order directing that the mother 1) submit to an evaluation for drug/alcohol abuse counseling and follow the recommendation of the evaluators; 2) submit to a psychological evaluation and follow the recommendation of the evaluator; 3) cooperate with the agency to obtain housing. The court also set the goal as reunification with the mother. The court was informed that the agency "attempted" to refer the mother for random drug and alcohol screens. The mother applied for Section 8 housing. The court directed the agency to refer the mother to a housing specialist. The court granted liberal visits at the foster home and ordered monthly agency visits, as long as the mother otherwise complied with the court's orders. In the event of noncompliance, the mother was to visit at the agency weekly. The court reserved decision of the issue whether the agency engaged in diligent efforts to assist the mother, and adjourned the case to October 15, 2002 to review the agency service plan.
Upon review on October 15, 2002, the court renewed its prior orders with regard to the mother, and specifically directed that she submit to random drug and alcohol screens. The court found "no efforts to date" and set November 19, 2002 as the final date for review of the agency's efforts. On November 19, 2002 neither substance abuse or psychological evaluations were available. On January 28, 2003 the court extended the children's placement effective September 30, 2002, finding that the children were in counseling at the agency and had made a good adjustment to the foster home. The court continued the prior dispositional order. It was reported that the mother was renting a room in Queens, and had no phone. The court again reserved decision on whether the agency had engaged in diligent efforts to assist the mother to reunite with her children. The court directed that unless the mother received a psychological evaluation the court would find that the agency had not engaged in diligent efforts. On March 7, 2003 the court accepted the parties' stipulation of diligent efforts, based upon agency reports.
The evidence
The agency submitted its case record in evidence. The record reflects that on October 15, 2002 this court directed the agency to arrange for a psychological evaluation for the mother, for alcohol and drug screening including random drug testing, and to assist with housing. The agency also was to arrange visits monthly at the agency. The record shows that although the case worker began on October 21, 2002 to search for a facility to provide a psychological evaluation for the mother, she was unsuccessful. In addition to contacting Flushing and Elmhurst hospitals, which were "not accepting new referrals," the worker contacted several service providers which would not perform "just a psychological evaluation." The case worker obtained a list of mental health centers in Queens and contacted a central information number. The case worker found a program entitled "Early Head Start" which offered parenting classes for children with emotional [*3]and behavioral problems.[FN1] The worker also contacted Safe Space, an informational and referral service for homeless families. In each instance, she left a message for the director. The worker also scheduled the first agency visit. She conveyed this information to the mother by telephone on October 28, and arranged to send referrals to the address of the maternal grandmother.
On October 29, the worker learned that the parenting skills program only offered classes to parents younger than the mother. On October 29, the worker received information from New Spirit that they could do both the drug abuse assessment and a psychological evaluation and provide any necessary follow up services. The worker provided New Spirit with the contact information for the mother. During the visit of October 29, the worker informed the mother that the New Spirit program would contact her. The case note also indicates that the worker gave the mother a letter for her job, explaining that she needed to attend court ordered agency supervised visits monthly. The mother was employed as a health care aide. On November 8, 2002 the mother contacted the case worker to let her know that New Spirit needed certain health test results which were available from her employer, where she had just received a physical. Using information provided by the mother, the worker obtained the information from the mother's employer and sent it to New Spirit, along with a letter requesting that they provide "drug screening" and a psychological evaluation for the mother. A November 12 case note states that the respondent had an intake appointment scheduled at New Spirit on November 16. The case worker reported to the court on November 19, that the mother would receive an intake assessment and "hopefully" a psychological evaluation as well as necessary follow up, at New Spirit.
On December 20, 2002 the mother reported to the case worker that New Spirit conducted two interviews and then assigned her to a group. She said she stopped going because they would not give her a psychological evaluation. The mother reported that she was working two jobs, at K-Mart at night and as a health aide during the day. Consequently, she did not have time to attend "Chemical Awareness" groups. New Spirit advised the case worker that they closed the mother's case because she stopped attending the groups. The mother visited in the presence of the agency case worker on December 31. The mother played with the boys, hugging them from time to time and telling them that she loved them.
On January 14, 2003 the case worker began to fill out a family reunification Section 8 voucher, but didn't have all of the information she needed from the mother. For the next ten days she called the grandmother's home, but got no answer. She apparently did not leave a message until January 24. When she did, the mother returned her phone call. The case worker gave the mother a referral to get a psychological evaluation at Brooklyn Hospital. She also obtained the information needed for the Section 8 application. The mother called back within twenty minutes to say that Brooklyn could not take the mother for the psychological because she lived in Queens. [*4]Brooklyn referred her to Elmhurst hospital. The case worker told the mother that she had tried Elmhurst before, but that "maybe they had openings." On January 27, the case worker submitted the Section 8 application to the ACS case manager for signature. The case worker duly noted on January 28 that the court would not find diligent efforts unless a psychological evaluation were arranged for the mother. The case worker again contacted Elmhurst, to be told that they were "so backed up" that they "weren't taking any more patients." The Elmhurst social worker faxed a list of psychotherapy centers in the area.
On February 6, 2003 the mother called the case worker to inform her that the mother was able to have a social worker, who worked in the home of her health aide client, perform a psychological evaluation. The case worker told the mother that she was still working on a referral "because a self-referred one wouldn't be enough." The mother also complained to the case worker that the foster father was unavailable for visits on the weekend, and that she had not seen her children in three weeks. The case worker immediately called the foster father and set a schedule of visits with him for the month of February. The case worker then called the mother to get her approval of the schedule. The mother also provided her medicaid number. On February 10 the mother called the case worker to complain that when she repeatedly attempted to call the foster father on Sunday regarding the visit, there was no answer. When she reached him, he stated that it was too late for her to visit. The foster father stated that the mother screamed at him on the phone and that he decided she should not visit "with an attitude." The case worker reminded both that there was a schedule to be adhered to, and followed up by sending a letter with the precise visiting plan.
On February 10, the case worker contacted the intake coordinator for the Advanced Center for Psychotherapy. After being assured that they could perform the psychological, the case worker faxed the information needed. The next day, the intake coordinator informed the case worker that he was not able to set up an appointment because he was "swamped with work." On February 13, the intake coordinator informed the case worker that he had lost the information because the agency was moving between offices. The case worker re-faxed the information. A week later, the coordinator called the case worker to report that the mother's medicaid number was not working. The case worker called the mother, who stated that she just learned that the number was not working, and had made an appointment at the medicaid office for the following day. On February 21, the mother called and provided the correct medicaid number. The case worker then again contacted the intake coordinator, who told her that he would arrange an appointment for the mother and provide the results by March 7. On February 25, the mother reported that she had the results of the psychological performed by the social worker she found. The case worker told the mother that she was arranging for her to be seen at the Advanced Center for Psychotherapy. The mother informed the worker that she had been certified as a home health aide and was looking for a better paying job. On February 26, the case worker contacted the intake coordinator at the Advanced Center. He again requested the mother's information. After the case worker faxed the information for the third time, the coordinator reported that he ran the mother's new medicaid number and "realized that Ms. T-s' plan is Blue Cross Blue Shield and Advanced Center doesn't accept that." He recommended Rockaway Mental Health.
[*5]
On February 28, the worker asked the mother to come to the agency for a random drug screen. The mother said that she could not come, because she "had to do her taxes at the library." The case worker attempted unsuccessfully to reach the mother by phone on March 3 and 4.
On March 4, the mother left a message with the case worker, reporting that her medicaid sequence number was different than the one the Advanced Center had. The case worker called the Advanced Center with the information. The case worker also called to get information about parenting programs for children with special needs. The case worker left information about the mother. The case worker called New Spirit to obtain the results of the intake assessment interview done in November.
There are no progress note entries for the month of April, aside from a foster home visit on April 23. The foster parent reported that the mother visited regularly on the weekends.
On May 13, the case worker called the mother to remind her of an interview for the Section 8 voucher and of the documents the mother needed to bring. The worker asked the mother whether she was attending AA meetings. The mother stated that she had gone twice. The case worker encouraged the mother to attend. The mother went to her Section 8 interview on May 16.
There are no progress notes for June, except a foster home visit. The mother continued to visit with the boys on the weekend.
The only progress note for July states that the worker spoke to the mother about a Section 8 appointment and asked her to call a doctor about Allen's eye, which needed corrective surgery.
Apparently, the mother received a psychological evaluation between February and August. A progress note of August 12 states that the worker asked the mother to come to the agency to sign a release for the psychological. The mother had an appointment to see an apartment on August 13. On August 14, the worker got correct contact information for the eye doctor whom the mother needed to call. On August 25, the case worker (Ms. Ryan) informed the mother that she would have a new worker after August 29. The mother informed the worker that she found a three bedroom apartment and was about to sign a lease. The mother also signed a release for the psychological evaluation "from Flushing Medical where she had it done." The case worker explained that ACS was court ordered to pay for parenting skills classes for the mother. The case worker advised the mother to attend AA meetings regularly, and informed her that the next court date was September 24.
The progress notes for September do not reflect any effort by the new case worker (Rogers) to contact the mother. She apparently first met the mother during the September 24 court appearance. A September 17 progress note reflects that the agency had yet to procure a special needs parenting class. Instead, the new case worker received a check request form to be sent to the service provider. The agency did not have the provider's social security number, nor [*6]did the case worker have the provider's telephone number. A progress note of September 24 reflects that the mother apparently met with a social worker from Flushing Hospital once on June 10, 2003, but did not appear for a second appointment on June 30. When the case worker asked Flushing to reschedule she was told that the hospital was "not accepting any more referrals at this time." The hospital referred the worker to the Advanced Center for Psychotherapy and Jamaica Hospital. The worker then began to replicate the process of the previous worker, apparently unaware of the events of February. However, on September 25, the mother called the new case worker to report that she in fact had an appointment scheduled at Flushing Hospital for a psycho- social the next day, and that she would have a psychological scheduled as well. The progress notes for September reflect that the foster father informed the case worker that the mother visited regularly and that the visits went well.
The progress notes for October reflect that the new case worker continued to replicate the efforts of the former case worker, contacting the Advanced Center for Psychotherapy, and speaking to the same intake coordinator who provided the same information regarding the need for a referral including the mother's medical insurance. After this contact, the worker received a call from the intake coordinator at Flushing Hospital, stating that the mother had a psycho-social and psychological evaluation done and was "waiting to be assigned a therapist." The case worker actually made one referral to the mother by mail, to Alcoholics Anonymous, by providing the number to the AA hotline. The worker's letter "asked about the status of her housing and provided a listing for Section 8." Apparently the worker also sent information to the parenting instructor. A week later, the worker spoke to the parenting instructor, who informed the worker that she had submitted the required forms to Little Flower twice in early September 2003. The case worker asked that the forms be sent to her directly. On October 29, the case worker spoke to the mother, who agreed to come to the office to take a drug test. The mother also informed the case worker that she obtained an apartment, and had the lease but no keys. She expected to have the keys in the middle of November. She informed the case worker that she continued to work as a cab driver, earning $250 a week. She stated that she completed the mental health evaluation and that the facility was waiting for a letter from the case worker, so that they could send the reports. The mother stated that the facility told her that they would call her if she needed to continue with their services. The mother stated that she does attend alcohol treatment, but not in one place. The case worker "advised the mother to contact one location and stay there." When asked about parenting classes, the mother stated that the previous case worker had not found a class for the mother. The worker then contacted the parenting skills provider, to obtain the information needed to pay her. The October progress notes reflect that the foster father reported the visits between the mother and the children in the foster home were going well.
On November 3, the case worker faxed the mother's release and letter of consent to Flushing Hospital, to obtain the evaluation. The case worker received the mother's psychiatric and psycho social evaluation on November 6. The evaluation did not recommend therapy or medication for the mother. On November 24, the mother called to tell the worker that the apartment for which she had a lease had been given to someone else. The mother received a new voucher from Section 8. The mother informed the worker that she had a credit from NYCHA [*7]and could obtain an apartment in the Linden housing project, but preferred not to live in a project. The case worker scheduled a meeting with the respondent mother for December 5, 2003. The progress notes indicate that the foster father reported the visits between the mother and children continued to go well. However, on December 7, the case worker informed the mother that because she failed to appear at the agency on December 5, she would not be permitted to visit at the foster home until she came to the office and met with the case worker. The worker informed the mother that she could only have visits at the foster home after she submitted to a urine screen, "because every time worker request [sic] that she come to the office she fails to show up."
The mother failed to attend the SPR on December 8, 2003. She called to say that she had recently been in a car accident and could not attend. The agency recommended a goal change. On December 10 the mother went to the agency and submitted to a urine test. She showed proof of parenting classes that she had been attending since December 4, 2003. The mother showed the worker a Section 8 voucher issued in July 2003 with an expiration date of November 21, 2003, and an extension to January 22, 2004. The mother showed the worker a copy of a lease and a down payment, and explained that the apartment had been rented to someone else with cash. The mother also showed the worker evidence that she enrolled in October in a program that would assist her in finding an apartment through Section 8. She said that she believed she had found another three bedroom apartment. She provided the worker with contact information for her Section 8 worker and the realtor. She also provided her medicaid number. The mother showed the worker proof of her income. She told the worker that she had been excused from her parenting class that day because she was falling asleep behind the wheel, but that she would make the class up. On December 18 the mother called the worker to ask if she could continue to see her children at the foster home. The worker told the mother that her visits were "reinstated." The mother informed the worker that the realtor requested a $1500 deposit, which she did not have. The case worker "suggested that she go to HRA because they may offer a program that would help pay for her deposit." The worker also learned that the mother went to Flushing Hospital for intake at a drug program. The worker also noted that she received the mother's drug test results which "showed that they were all negative." On December 23, the worker informed the foster father that the mother was permitted to visit in the foster home. On December 26, 2003 the agency received approval for a change of goal to adoption. On December 31, the respondent visited in the foster home while the case worker was present. She brought Christmas presents for the children, who seemed happy to see their mother.
Despite the negative drug tests, the mother was accepted into a drug program at Flushing Hospital. She completed intake on December 18, 2003. However, the mother did not attend thereafter. On January 13, 2004 the mother informed the case worker that she purchased a minivan, and drove for Livonia Car Service. She also informed the worker that she had found a new apartment. She reported receiving the certificate for parenting classes, and that she continued to attend AA meetings. The mother also reported that her drug test results were all negative. The mother acknowledged receiving a letter from the drug program saying she would be terminated. She said she would attend a session the next day. The case worker also asked the [*8]mother to request a typed copy of her psychiatric evaluation from the hospital while she was there. On January 27, the program informed the worker that the mother only attended on January 20. On January 28, the mother called to say that she had an apartment in Queens and was waiting for an inspection. She expected to have the lease and keys within two to three weeks. The drug program informed the case worker that all of the mother's drug screens had been negative. On January 29 the case worker received confirmation that the mother completed her parenting skills program.
On February 3, 2004 the case worker received the termination of parental rights petition. On February 6, the mother's counselor informed the agency that the mother stated that she needed a program closer to her residence, and that it was inconvenient for her to attend the program. The case worker agreed to refer the mother to a program closer to her residence. The progress notes indicate that the mother continued to visit consistently with the children at the foster home.
Conclusions of law
It is well settled that the threshold inquiry in a proceeding for permanent neglect under SSL § 384-b is whether the agency has met its burden of demonstrating that it made "diligent efforts to encourage and strengthen the parental relationship when such efforts will not be detrimental to the best interests of the child" (Social Services Law § 384-b [7][a]; see, Matter of Star Leslie W., 63 NY2d 136, 142] In evaluating an agency's efforts, we turn first to the statutory guidelines found in Social Services Law § 384-b (7)(f). [see, Matter of Sheila G., 61 NY2d 368, 385]. "An agency must always determine the particular problems facing a parent with respect to the return of his or her child and make affirmative, repeated, and meaningful efforts to assist the parent in overcoming these handicaps" [id., at 385] Given the agency's superior position and ability, it was petitioner's obligation to assess the parent's needs and then take meaningful affirmative steps necessary to remove obstacles that stood in the way of effecting reunification of the family. [SSL § 384-b [7][f][3]; see, Matter of Sheila G., supra, 61 NY2d at p. 381] As the Court of Appeals noted:

"[T]o enable a child to return to his or her family, an agency must have the capability to diagnose the problems of the parent and of the child; access to a host of concrete supportive and rehabilitative services; cooperation with community treatment programs (such as health, alcohol, and drug treatment); and a casework staff that can motivate the parents to avail themselves of services ..... The parties are by no means dealing on an equal basis. The parent is by definition saddled with problems: economic, physical, sociological, psychiatric, or any combination thereof. The agency, in contrast, is vested with expertise, experience, capital, manpower and prestige. Agency efforts correlative to their superiority are obligatory.... The corollary to the agency's dominant position is that indifference by the agency may greatly serve to impede a parent's attempts at reunification.... Of course, transcending the practical reasons for providing a threshold requirement that an agency exercise diligent efforts toward reuniting parent and child is the strong public policy that before the State may terminate parents' rights [*9]it must first attempt to strengthen familial ties .... retention of the diligent effort requirement reflect[s] a sound societal value in addition to considerations of fundamental equity, if not constitutional rights, that the State should exercise reasonable efforts to restore familial relationships before seeking to terminate them." [Id., at 381-383 [emphasis added]]
Here the court's original disposition on July 12, 2002, required the agency to assist the mother to 1) submit to an evaluation for drug/alcohol abuse counseling and to follow the recommendation of the evaluators; 2) submit to a psychological evaluation and to follow the recommendation of the evaluator; and 3) obtain housing. In each instance, the mother encountered obstacles which the agency was unable meaningfully to assist her to overcome. The case record demonstrates that the agency failed to make a timely assessment of the mother's needs, and failed to deliver services meaningfully tailored to fit the obstacles preventing the mother from taking care of her children. Although the case workers spent a lot of time trying to obtain an assessment of the mother's needs, as directed by the court, they were unable to access the services necessary to provide a reliable assessment.
With regard to an evaluation for drug and alcohol counseling, the mother cooperated with the agency referral to New Spirit in November 2002, by obtaining medical information through her employer. At that time, the mother was employed as a home health aide. The case worker obtained the information from the mother's employer and sent it to New Spirit, along with a letter requesting that they provide "drug screening" and a psychological evaluation for the mother. She received an intake and was assigned to a group. The mother protested that as she worked two jobs, at K-Mart at night and as a health aide during the day, she was unable to attend a chemical awareness program. Several months later, on February 28, 2003 the worker asked the mother to come to the agency for a random drug screen. The mother said that she could not come, because she "had to do her taxes at the library." It was not until March 4, 2003 that the case worker called New Spirit to obtain the results of the intake assessment interview done in November. There is no indication that the evaluation was ever received. On May 13, the case worker asked the mother whether she was attending AA meetings. The mother stated that she had gone twice. The case worker encouraged the mother to attend. In August, the departing case worker advised the mother to attend AA meetings regularly. In October 2003, the new case worker made one referral to the mother by mail, to Alcoholics Anonymous, by providing the number to the AA hotline. On October 29, the case worker spoke to the mother, who agreed to come to the office to take a drug test. The case worker asked the mother if she attended any kind of treatment. The mother stated that she did attend alcohol treatment, presumably AA, but not in one place. The case worker "advised the mother to contact one location and stay there." After the case worker informed the mother that she could not visit in the foster home unless she submitted to random drug screens, on December 10 the mother went to the agency and submitted to a urine test. On December 18, the worker learned that the mother went to Flushing Hospital for intake at a drug program. The worker also noted that she received the mother's drug test results which "showed that they were all negative." In January, 2004, the mother informed the case worker that she continued to attend AA meetings.
[*10]
While the mother may not have submitted to random drug screens whenever asked to do so, and did not consistently attend drug or alcohol counseling, there was never any evidence that the mother had a substance abuse or alcohol problem. In fact, the agency was inconsistent in its referrals in this regard; directing the mother at times to attend substance abuse treatment, and at other times to attend AA meetings. This is a function of the agency's failure to implement the initial court order that the agency assess the mother's need for such counseling. The mother cooperated with the agency's initial efforts to obtain the assessment by New Spirit in November 2002. There is no indication that the assessment demonstrated a need for alcohol or substance abuse counseling. In fact, the evidence in the record tends to prove the opposite. The mother consistently tested negatively for any substances. The mother submitted proof to the agency that she was steadily employed, first as a home health aide and later as a livery driver. There is no evidence that her employment was ever interrupted by substance abuse, such as having her driver's license sanctioned for DWI.
With regard to the psychological evaluation, although the case worker began on October 21, 2002 to search for a facility to provide an evaluation for the mother, she was unsuccessful. In addition to contacting Flushing and Elmhurst hospitals, which were "not accepting new referrals," the worker contacted several service providers which would not perform "just a psychological evaluation." The case worker obtained a list of mental health centers in Queens and contacted a central information number. In December 2002, the mother informed the worker that New Spirit would not give her a psychological evaluation. On January 24, 2003 the case worker gave the mother a referral to get a psychological evaluation at Brooklyn Hospital. The mother called back within twenty minutes to say that Brooklyn could not take her for the psychological because she lived in Queens. Brooklyn referred her to Elmhurst hospital. The case worker told the mother that she had tried Elmhurst before, but that "maybe they had openings." The worker duly noted on January 28, 2003 that the Family Court would not find diligent efforts unless a psychological evaluation was arranged for the mother. The case worker again contacted Elmhurst, to be told that they were "so backed up" that they "weren't taking any more patients." The Elmhurst social worker faxed a list of psychotherapy centers in the area. On February 6, 2003 the mother called the case worker to suggest that a social worker, who worked in the home of her health aide client, perform a psychological evaluation. The case worker told the mother that she was still working on a referral "because a self-referred one wouldn't be enough." On February 10, the case worker contacted the intake coordinator for the Advanced Center for Psychotherapy. After being assured that they could perform the psychological, the case worker faxed the information needed. The next day, the intake coordinator informed the case worker that he was not able to set up an appointment because he was "swamped with work." On February 13, the case worker re-faxed the information. A week later, the coordinator called the case worker to report that the mother's Medicaid number was not working. The case worker called the mother, who stated that she just learned that the number was not working, and had made an appointment at the Medicaid office for the following day. On February 21, the mother called and provided the correct Medicaid number. The case worker then again contacted the intake coordinator, who told her that he would arrange an appointment for the mother and provide the results by March 7. On February 25, the mother reported that she had the results of [*11]the psychological performed by the social worker she found. The case worker told the mother that she was arranging for her to be seen at the Advanced Center for Psychotherapy. On February 26, the case worker contacted the intake coordinator at the Advanced Center. He again requested the mother's information. After the case worker faxed the information for the third time, the coordinator reported that he ran the mother's new Medicaid number and "realized that Ms. T-s' plan is Blue Cross Blue Shield and Advanced Center doesn't accept that." He recommended Rockaway Mental Health. On March 4, 2003 the mother left a message with the case worker, reporting that her Medicaid sequence number was different than the one the Advanced Center had. The case worker called the Advanced Center with the new information.
The mother received a psychological evaluation between February and August, 2003, at Flushing Hospital. The court's order that the agency assess the mother's need for psychological services was a year old. The children had been in foster care for two years. In August, 2003, the mother signed a release for the psychological evaluation from Flushing Medical. In October, 2003, the new case worker contacted Flushing Hospital, and learned from the intake coordinator that the mother had a psycho-social and psychological evaluation done and was "waiting to be assigned a therapist." On November 3, 2003. the case worker faxed the mother's release and letter of consent to Flushing Hospital, to obtain the evaluation. The case worker received the mother's psychiatric and psycho-social evaluation on November 6, 2003. The evaluation actually did not recommend therapy or medication for the mother.
With regard to housing, on January 14, 2003 the case worker began to fill out a family reunification Section 8 voucher, but didn't have all of the information she needed from the mother. For the next ten days she called the grandmother's home, but got no answer. She apparently did not leave a message until January 24. When she did, the mother immediately returned her phone call. The case worker obtained from the mother the information needed for the Section 8 application. On January 27, 2003 the case worker submitted the Section 8 application to the ACS case manager for signature. On May 13, 2003 the case worker called the mother to remind her of an interview for the Section 8 voucher and of the documents the mother needed to bring. The mother went to her Section 8 interview on May 16. The mother had an appointment to see an apartment on August 13. On August 25, the mother informed the worker that she found a three bedroom apartment and was about to sign a lease. On October 29, the case worker spoke to the mother, who informed the case worker that she obtained an apartment, and had the lease but no keys. She expected to have the keys in the middle of November. On November 24, the mother called to tell the worker that the apartment for which she had a lease had been given to someone else. The mother received a new voucher from Section 8. The mother informed the worker that she had a credit from NYCHA and could obtain an apartment in the Linden housing project, but preferred not to live in a project.
On December 10, 2003 the mother showed the worker a Section 8 voucher issued in July 2003 with an expiration date of November 21, 2003, and an extension to January 22, 2004. The mother also showed the worker a copy of a lease and a down payment, and explained that the apartment had been rented to someone else with cash. The mother showed the worker evidence [*12]that she enrolled in October in a program that would assist her in finding an apartment through Section 8. She said that she believed she had found another three bedroom apartment. She provided the worker with contact information for her Section 8 worker and the realtor. The mother showed the worker proof of her income. On December 18 the mother called the worker to inform her that the realtor requested a $1500 deposit, which she did not have. The case worker "suggested that she go to HRA because they may offer a program that would help pay for her deposit." On January 28, 2004 the mother called to say that she had an apartment in Queens and was waiting for an inspection. She expected to have the lease and keys within two to three weeks. There is no indication that the mother was able to obtain the apartment before the termination petition was filed.
In addition to the foregoing, the mother completed a parenting program for special needs children, despite the agency's difficulties in locating such a program and in arranging payment. She maintained regular employment. She visited the children regularly at the foster home, and maintained regular contact with the agency case workers.
In the court's view, the agency simply failed to take sufficient steps to provide meaningful assistance to the mother to address the obstacles preventing her children from being discharged from foster care. First, the agency failed to adequately assess the mother's needs in a timely manner. Although the mother did not regularly attend AA meetings or a drug or alcohol program, there is simply inadequate proof that such a program was necessary to her ability to care for her children. All of the evidence indicates that the mother maintained sobriety sufficiently to hold a job, to look for a place to live, to visit regularly with her children and to assist the workers to obtain information needed to arrange parenting classes and the requisite evaluations. [Cf., e.g., Matter of Robert F, 195 AD2d 715 [3rd Dept. 1993]] The agency did not attempt to obtain the November 2002 assessment from New Spirit until March 2003. There is no evidence that the assessment was ever actually obtained. Similarly, the psychological evaluation which the mother was eventually able to complete with great persistence, was not received by the agency until the mother's children had been in care for two and a half years. The evaluation did not indicate any need for therapeutic intervention. By all accounts, her relationship with her children was positive and loving, and her interaction with them appropriate.
Second, in the area in which the mother required concrete assistance, which was housing, the agency was unable to provide meaningful assistance. Although possessed of a Section 8 voucher, the mother was unable to use it effectively, in the absence of sufficient funds for a deposit. When informed that the landlord of one apartment had rented the apartment to someone with cash, and that the landlord of another apartment required a $1500 deposit which the mother did not have, the workers did nothing. In the former instance, there is no indication that the agency even spoke to the realtor or the Section 8 representative. In the latter case, the worker simply told the mother that she believed HRA might be able to assist her, without providing any [*13]specific information to the mother regarding accessing the assistance of HRA.[FN2] Nor did the workers offer to contact NYCHA, with regard to the mother's possible eligibility for public housing, after she informed them that she had a credit with NYCHA.
In brief, the mother did not fail to take advantage of the psychological and other services available to her. Rather she did virtually everything that the agency requested, and even provided the case workers with assistance to obtain medical information from her employer, to obtain information regarding her Medicaid number, to obtain a psychological evaluation, and to secure adequate housing for herself and her children. She was neither uncooperative nor indifferent. On this record, even drawing every inference favorably to the petitioner, there is insufficient evidence to clearly and convincingly establish that the mother permanently neglected her children within the meaning of the statute. Insofar as clear and convincing evidence of diligent efforts is a threshold requirement in establishing permanent neglect, without proof of which the agency fails to establish a prima facie case [See, e.g., In re Albert R., 2 AD3d 528 [2nd Dept. 2003]; In re Jawan Y., 278 AD2d 540 [3rd Dept. 2000]], such failure of proof requires dismissal even upon inquest. Accordingly, the petition is dismissed with prejudice.
The foregoing constitutes the opinion, decision and order of the court.
May 26, 2005________________________________
Lee H. Elkins, JFC
Footnotes

Footnote 1: An agency psychologist, and weekly therapist for both boys, subsequently found that they suffer from moderate ADD and suggested a psychiatric consultation regarding possible medication. Noah attended the LAMM school, in special education.

Footnote 2: In fact, the Administration for Children's Services maintains an office for the sole purpose of administering grants to facilitate parents in need of housing to reunite with their children. This information was apparently unknown to the agency case worker.