Matter of Starrtasia Ann W. (2003 NY Slip Op 51714(U))

[*1]

Matter of Starrtasia Ann W.

2003 NY Slip Op 51714(U)

Decided on December 2, 2003

Family Court, Queens County

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on December 2, 2003

Family Court, Queens County
In the Matter of the Commitment of Guardianship and Custody of STARRTASIA ANN W. A Child Under the Age of Eighteen Years Pursuant Section 384-b of the Social Services Law of the State of New York.
Docket No. B15782-02

Marybeth S. Richroath, J.
As a result of a neglect finding on Docket N14430-1/99, Shameka W.'s children Shanaysia and Starrtasia were placed with the Commissioner for an initial period of 12 months, effective December 22, 1999. Starrtasia, the subject child in this proceeding, has been continuously in care since that date. On October 30, 2002, Lutheran Social Services, on behalf of the Administration for Children's Services, filed a petition to terminate the parental rights of Shameka W, Starrtasia's mother. A trial on the petition was held on September 2, 2003 and October 2, 2003. The petitioner called a case worker who had not been involved with the family, but who authenticated case records which were received into evidence. Respondent mother testified on her own behalf. Summations were heard on October 30, 2003. For the reasons outlined herein, the Court finds that petitioner has failed to meet its burden of proof of clear and convincing evidence that respondent permanently neglected the subject child and dismisses the petition.
BACKGROUND
Respondent Shameka W. was born on June 14, 1983, and was just 16 when her daughter, Starrtasia, the subject child of this proceeding, was born on July 15, 1999. The original neglect petition alleged that respondent left the child with respondent's mother (the subject child's grandmother) "and other unknown individuals" without making adequate provisions for her care. There were also allegations of poor hygiene and medical neglect with respect to a serious diaper rash. Respondent made an admission to neglect on May 1, 2000 and the subject child was placed with the Commissioner for an initial period of twelve months, effective December 22, 1999. The goal of the permanency plan was return to parent, and respondent was expected to complete parenting skills classes, engage in therapy and to obtain suitable housing and employment in order to meet that goal.
THE EVIDENCE AT FACT-FINDING
The Administration for Children's Services engaged Lutheran Social Services as the foster care agency to manage this family. The record before the Court contains no evidence as to [*2]when this agency received the contract. There are no records at all with respect to the period from December 22, 1999 when the subject child was placed in care through January 2, 2001, a period of more than one year. The case records placed into evidence by the petitioner contained records for the period January 3, 2001 through July 13, 2001, prepared by caseworker Justine Nolle; nothing from July 13, 2001 through September 17, 2001; one report by a caseworker J. Latrille dated September 18, 2001; nothing from September 19, 2001 through December 12, 2001; reports from caseworker Princella Stover from December 13, 2001 through February 12, 2002; nothing from February 12, 2002 through September 4, 2002; reports from caseworker V. Sanes from September 5, 2002 through mid October 2002; a report from D. Robinson from October 30, 2002; a UCR Face sheet containing a case update dated September 26, 2002; an undated Court Ordered Investigation ("COI") which appeared from the text to relate to the period April-May 2001. In sum, though Starrtasia was in care from December 1999 through October 2002,[FN1] almost three full years, the agency placed into evidence only records documenting an assorted 13 months of casework by no less than five different caseworkers. Respondent testified on her own behalf. The Law Guardian did not present any independent evidence.
VISITATION
The petitioner alleges that although the agency "arrang[ed] visitation between the respondent and her child and encourag[ed] her to visit regularly with the child," respondent "for more than a year following the date on which the child came into petitioner's care, failed substantially and continuously or repeatedly to maintain contact with...the child." Petitioner has not met its burden of proof by clear and convincing evidence with respect to this allegation. There are no records at all for the period from December 22, 1999 through January 2, 2001. During the period from January 3, 2001 through April 12, 2001, the subject child was in kinship foster care with her maternal grandmother. The caseworker's records do not reflect any formal visitation schedule set up by the agency between respondent and the child. In fact, the casework records only noted the visits by respondent to the subject child in the foster home in passing, as part of her observations in home visits at the foster home, or in conversations with the foster mother. However, those limited references suggested that the visitation between respondent and the child was regular and frequent during this period of time. On April 12, 2001, the subject child was removed from her maternal grandmother and placed in non-kinship foster care.[FN2]
The case record reflects two office visits, on May 3, 2001 and May 22, 2001, scheduled by the agency during the period that the subject child was in non-kinship foster care, between April 12, 2001 and June 5, 2001. The Court Ordered Investigation ("COI"), received into [*3]evidence at fact-finding as Petitioner's Exhibit 4, shows that respondent gave birth to her third child on April 23, 2001, came to Court for a scheduled appearance relating to the subject child on April 26, 2001, and that the agency set up the above visits only after respondent called to request them after that Court date.[FN3] Respondent attended both visits and the COI states that she "interacted well with the children." There is no record that the agency set up any other visits between respondent and the subject child during this period. It is noteworthy that because the child was in non-kinship care, the only way respondent would be able to visit was through the agency. On June 5, 2001, the subject child was returned to the maternal grandmother.
The child remained in kinship foster care with the maternal grandmother from June 5, 2001 until September 2001. During this period there is no record that the agency set up any visitation schedule between respondent and the subject child. Again, references to visits between birth mother and the child are made in passing; the case record notes that respondent was present when the child returned to the maternal grandmother from non-kinship care, and that respondent was present at the home when the caseworker made a home visit to the foster home on July 13, 2001. There are three reports for the period June 5, 2001 through July 13, 2001 and no reports at all for the period from July 13, 2001 through September 17, 2001. A record of a foster home visit from September 18, 2001 reflects the maternal grandmother's wish that the child be removed again from her care. This report reflects the fact that the maternal grandmother had requested a 10-day notice form from the agency, had filled it out and mailed it back, though it had not yet been received by the agency. There are no records in evidence reflecting those contacts between the grandmother and the agency. Caseworker Latrille notes in that report that "removal is imminent" and that the "[g]oal is 01 [return to parent] will be changed to 04 [adoption] upon removal from Ms. W."
Presumably, based upon caseworker Latrille's notes, the child was placed in a non-kinship, pre-adoptive home. However, there are no records in evidence as to the period between September 18, 2001 and December 12, 2001. There is no record reflecting the exact date when the child was removed from the maternal grandmother's care. There is no record that the agency communicated its change in permanency plan to respondent. There is no record that the agency communicated the change in the subject child's placement (i.e. where she was placed now) or set up a visitation schedule with respondent. There is no record of any contact or attempted contact between the agency and respondent. In fact, there is affirmative evidence that the agency prevented respondent from visiting with the subject child.
 The next report, dated December 13, 2001, reflects a non-kinship foster home visit by caseworker Princella Stover. She records that the foster family was going to Boston with the subject child and their other children for Christmas. The caseworker makes reference to visits between the subject child and respondent otherwise undocumented in the records before the Court, by saying, "Shameeka visits (sic) are infrequent to agency but when they take place they go fine." There is no record before the Court of a visitation schedule set up by the agency, of any [*4]attempts by the agency to contact respondent nor of any visits set up by the agency and missed by respondent. There is also no record that the agency contacted respondent to arrange holiday visitation for her with the subject child, or made any attempt to do so. To the contrary, the next report, dated 1/9/02, also completed by caseworker Princella Stover, contained a handwritten addendum to the report, "caseworker became aware of case being assigned her (sic) through FM who called in December and BM who called also in December caserecord (sic) given to cw on 1/10/02 from kinship unit." Ms. Stover's record documents a visit between respondent and the children on January 9, 2002.
As outlined above, in this case the petitioner proved its case purely by putting into evidence records relating to respondent after laying a proper business record foundation. Thus, there was no testimony or cross-examination of Ms. Stover as to how she could make an entry indicating that she had no knowledge of this family until January 10, 2002, when she reported that she had made a home visit to the foster home on December 13, 2001, and referred to some visitation by respondent in that report. The December 13, 2001 record indicates that the subject child was going to be in Boston for the Christmas holidays, and there was no testimony before the Court as to how or whether the agency explained that to respondent when she called the agency in December to arrange a visit with her child.
Respondent testified that she visited frequently when the subject child was in kinship care, but had problems setting up visits when the child was in non-kinship care because the agency was unresponsive to her. These reports, and the absence of any reports showing that the agency attempted to contact respondent and set up visitation, corroborated respondent's testimony.
The next record in evidence, progress notes from Ms. Stover dated February 7, 2002, is a home visit exploring the paternal grandmother of the subject child's older sibling as a resource. Ms. Stover notes, "BM visits bi-weekly visits a [sic] good." There is no record of a schedule of visitation set up by the agency.
There were no records at all offered or received into evidence for the period February 13, 2002 through September 4, 2002. Progress notes dated September 5, 2002, completed by caseworker Sanes state that "BM has not visited with the child since February of this year." The same report says, "PPG was changed to 04 adoption. BM has been out of contact since February." There is no factual record to substantiate this assertion. There is no record of a schedule of visits set up by the agency. There is no record that respondent failed to attend a scheduled visit. There is no record that the agency attempted to contact respondent and was unable to do so. There is simply no evidence at all.
Moreover, the agency's own records cast doubt upon the assertion that respondent had been out of contact with the agency since February. In the UCR filed with ACS, dated 9/26/2 (sic) and received into evidence as Petitioner's Exhibit 3, caseworker Alicia Munoz notes that the birth mother's last "face-to-face contact with the child was on 8/27/02." There is no record documenting this visit. The UCR contains further information about how the subject child came to be placed with her sibling's paternal grandmother. Apparently that resource petitioned the Court for custody of the older sibling, and then came to the agency requesting that the subject child be re-united with that sibling in her home. This apparently was accomplished by April 28, 2002, as reflected in the UCR.
[*5]
The agency's progress notes, completed by D. Robinson and dated October 30, 2002, state, "BM has not visited with the child since February of this year." However, in a progress note completed by V. Sanes on October 7, 2002, that worker notes a call to respondent at a telephone number where the worker cancelled an apparently previously scheduled visit because, "October 14th is a holiday and the agency is closed. CW rescheduled the parent/child visit for the 21st." There is no agency record documenting how the October 14th visit was scheduled. Again, for the period September 2002 through October 2002 there is no schedule of visitation and no notes that the respondent failed to appear for any visit. In fact, the October 21, 2002 visit was documented, and caseworker Sanes' progress notes for that date include the note, "BM told CW that she had not seen the girls since February (sic). CW asked BM why and she did not have an explanation for this." Due to the fact that only records were received into evidence, there was no explanation as to why various agency documents would repeat that the mother had failed to visit from February 2002 through October 2002 when other agency documents showed that visits had taken place. This raises substantial questions as to the reliability and credibility of these records.
Moreover, respondent testified in detail with respect to the relevant time period. She stated, credibly, that she was "down South" during February 2002 and thus out of contact with the agency, but that she returned in March 2002, and began calling the agency, seeking to resume contact with her children. She stated that while they were in non-kinship care, she had difficulty setting up visits. The UCR mentioned above indicates that the subject child was moved to the paternal grandmother of her older sibling in April 2002. Respondent stated that she had irregular visitation at the foster home with the child while she was in this placement. As noted above, there is no agency record of any visitation schedule set up by the agency.
Respondent testified credibly that she had contacted Ms. Stover in July 2002 to make arrangements for a birthday visit with Starrtasia, whose birthday is July 15. Respondent appeared at the agency, but the foster mother did not bring the child. Respondent testified that Ms. Stover set up a make-up visit in the Bronx for the Saturday following July 15, 2002, and respondent testified credibly that she waited for four hours in a McDonald's for the foster mother to appear. Respondent did not have a visit with Starrtasia on either day. Remarkably, there are no records in evidence relating to these contacts. Respondent went on to say that she had also sought a visit with the subject child and her sibling, who were placed together, for the sibling's birthday in August 2002. It is unclear whether the face-to-face contact with the subject child noted in the UCR was in connection with respondent's efforts to have an August visit with the children. The Court credits the respondent's testimony with respect to her efforts to visit Starrtasia. Agency records in evidence before the Court provide a motive for the reluctance of the foster care resource to cooperate in allowing respondent to visit with the subject child, and therefore corroborate respondent's testimony. While this resource is not related to the subject child, she is the paternal grandmother of the subject child's older sibling. The case record documenting a home visit with this resource indicated that she was quite concerned that respondent had failed to acknowledge her son as the father of the older sibling, and appeared to bear some ill will against respondent for this failure. There was no documentation as to why this resource was chosen as the resource for the subject child, particularly in view of the fact that respondent had presented other resources with whom she was on better terms. In any event, however, the Court finds that the agency has woefully failed in its burden to show due diligence [*6]in arranging and encouraging visitation between respondent and the subject child.
PARENTING SKILLS
The agency alleges that it "referr[ed] the respondent to parenting skills training classes and encourag[ed] her to attend the classes." On this issue the case records received into evidence show that caseworker Nolle made a referral for the respondent mother to attend a class at the Negro Council for Negro Women ("NCNW") on January 3, 2001. As of February 15, 2001, respondent reported that she was attending. On February 27, 2001, the caseworker called the program to confirm respondent's attendance. All further information on that report was redacted from evidence. On March 2, 2001, it was reported that respondent had not completed parenting skills. On June 15, 2001, respondent reported to the caseworker that she was attending a parenting skills class at NCNW. There was no record of any referral by the caseworker back to NCNW and in the absence of such information, the Court infers that respondent sought out the program again herself. On July 13, 2001, the caseworker reported only that respondent said that she was "doing what I need to do." A report dated February 7, 2002 notes that respondent has not completed parenting skills. There are no other references to the goal of parenting skills in the case record, other than notes stating that respondent had not completed a parenting skills course. Notably, other than the one referral to NCNW in January 2001, the records show no other referral by the agency to a parenting skills class for the respondent.
Respondent testified that while she had not completed a parenting skills class between January 2001 and October 2002, when this petition was filed, after this petition was filed, Alicia Munoz, another caseworker from the agency made a new referral for parenting skills in January or February 2003. Respondent testified credibly that she finished the course by April 2003. She also testified that the initial referral was made when she was pregnant and required her to travel for the class into Manhattan. This second referral, which was completed, allowed her to take the course in her home borough of Queens. The Court credits the testimony of respondent and finds that clearly, the agency did not meet its burden of diligence between January 2001 and October 2002, in assisting the respondent to attain this goal.
THERAPY
The petitioning agency alleges that it referred respondent for mental health counseling and encouraged her to attend counseling. Between January 2001 and March 2, 2001, there were at least three progress notes devoted to the therapeutic services being sought for the foster mother (maternal grandmother) to address her "stress" and give her emotional support. There was no record showing any referral at all for therapy or mental health services for respondent. On March 2, 2001, at an "SPR" it was noted that respondent had not "completed any of the mandated services ... parenting skills, income/housing, therapy." There are no agency records reflecting referrals to therapy for the respondent.
There is a progress note from May 31, 2001 indicating that caseworker Nolle visited respondent's address for a home visit and discovered that respondent was not there. The note states that Nolle was expecting respondent to be attending a program at ASPIRE. ASPIRE is referenced in the COI also received into evidence at the fact-finding. There it is reported that as of May 10, 2001 respondent was attending the ASPIRE program, but the caseworker was unable to provide the Court with information as to exactly what services respondent was receiving there. There are no other references to that program in the case record. Thus, there is no agency record [*7]of the agency's referral of the respondent to this program, nor any indication of what aspect of respondent's plan it might relate to, what encouragement respondent was given to go to and stay in the program and when or why respondent failed to continue in the program.
Another reference to therapy in the records is a progress note from June 15, 2001 that respondent had told the caseworker that respondent had scheduled an intake at the Arista Center for Psychotherapy in Queens to begin therapy. Respondent made clear in her testimony that the agency had not referred her for this appointment; her mother had suggested it to her. Respondent testified that she completed the intake and began therapy, but felt that the therapist was sharing respondent's sessions with respondent's mother. Therefore respondent stopped attending therapy. In the progress notes from the January 9, 2002 visit between respondent and the subject child, caseworker Stover indicates that, "birth mother ... has only started therapy in what in needed to complete her goals." There is no note as to where and with whom this therapy was taking place, whether the agency had made a referral, and what respondent's progress was. It is clear that the agency failed to meet its burden of showing that it made diligent efforts to engage respondent in therapy.
PUBLIC ASSISTANCE
The agency alleges that it made diligent efforts to work with respondent, including providing her with assistance in "obtaining public assistance." Respondent was 16 when the subject child was placed in care. She told the caseworker, as noted in the case record on January 3, 2001, that she required assistance with the public assistance application process. The caseworker apparently offered this assistance at that time, but was waiting for respondent to decide upon an official address. The next discussion documented in the records with respect to public assistance for the respondent, took place on January 8, 2001 between the caseworker and respondent's mother. Respondent's mother informed the caseworker that respondent could open her own public assistance case but "must have an adult at BM's current address declare responsibility for BM due to her age." There is nothing in the case records that shows that the agency addressed this issue.
On January 16, 2001, progress notes completed by caseworker Nolle show that respondent was planning, inter alia, to get a job at a local mall in order to "gain stability and income in order to get her children back." At a February 15, 2001 home visit with respondent, caseworker Nolle noted that respondent was in the process of applying for work at J.C. Penney.
The issue of income and housing is not addressed in the case record again until June 15, 2001.During a home visit with respondent, at an address which is not noted in the report, the caseworker notes, "BM stated that she intended to begin working, as she was in need of income... CW offered again to assist BM in obtaining Public Assistance benefits." Inasmuch as respondent turned 18 the day before this home visit, she was eligible to receive benefits on her own behalf, without having an adult sign for her. However, there is no record that the caseworker provided forms for respondent, told her what was required, set up an interview for her or performed any other concrete service. It is also interesting that respondent was talking to the caseworker about finding a job, and the caseworker was offering public assistance.
The next reference to a source of income for respondent is contained in progress notes from Ms. Stover dated February 7, 2002. There she noted that respondent reported that she was working in a Pathmark on 125th Street.
[*8]
PERMANENT ADEQUATE HOUSING
The agency alleges that it worked with respondent to assist her "in securing permanent, adequate housing." Although the subject child was placed with the maternal grandmother at the inception of this case, the case record shows that as early as January 16, 2001, respondent had advised Ms. Nolle that her mother was not a reliable resource. Respondent was correct, as the agency learned after the maternal grandmother relinquished the subject child twice in five months. The caseworker explored respondent's residence at Beverly Hawkins' home in the Bronx on January 22, 2001; the report appears positive, however, the subject child was not placed there. No reason is given for why this resource was rejected by the agency.
The next reference to housing for respondent is in two notes of telephone calls made by caseworker Nolle on March 13, 2001. Apparently there was an opening at Inwood House, but Ms. Nolle was having difficulty contacting respondent on March 13 to let her know. The COI received into evidence at the fact-finding shows that the Inwood House placement was a voluntary foster care placement arranged by the maternal grandmother and caseworker for respondent. The COI indicates that respondent was at Inwood House from April 3, 2001 through April 6, 2001, when she "went AWOL." The COI states that respondent was three centimeters dilated and about to give birth; the agency placed a "social hold" on the expected child, but that the child went home with respondent after his birth, for reasons the report states "are unclear." The next note is from April 12, 2001 and does not mention Inwood House.
Respondent testified on cross examination that caseworker Nolle referred her to a mother-child "shelter;" that she went, though the subject child never accompanied her there; that she was pregnant and expecting to deliver soon after she went; that her belongings were stolen and she was having disputes with other residents; and that she feared the loss of her expected child to ACS if she continued in that program. She testified that she left that program. Nothing in the case record addresses any of the issues raised by respondent or shows that the agency provided respondent with any sort of encouragement or support to remain in Inwood House, if indeed this was the program that respondent admitted she attended. Moreover, while counsel for petitioner referred to Inwood House and "mother-child placement" interchangeably, there was no evidence before the Court that Inwood House was a "mother-child placement." The only evidence in the records before the Court was that respondent was placed at Inwood House as a result of a voluntary placement of her by her mother once respondent's mother confirmed respondent's pregnancy.
The issue of housing is not addressed in the case record again until June 15, 2001. Caseworker Nolle completed a home visit with respondent at which she held and observed respondent's baby Moasia, who was with the respondent and appeared well. "CW reminded BM that housing was available if and when she should decide to move out of the McCray home." Respondent was living there with her new baby and presumably, given the title of the home used by the caseworker, that baby's father. The caseworker did not find that this housing posed an imminent risk to the new baby, Moasia, since that child was left in the care of respondent at that location. The record contains no explanation as to why this address was unsuitable for the return of Starrtasia, while not posing a risk to the new baby.
RESPONDENT'S INDEPENDENT EFFORTS
During the time period that this case spanned, respondent, of her own accord and without [*9]any help or encouragement from the agency, completed her GED, secured gainful employment and has been caring successfully for two additional children. Respondent provided the names of resources to care for her children on at least three occasions when there were issues with the resources identified by the agency. Respondent knew that she was required to financially provide for her children, and that they would need a safe place to live. The records provided as evidence to the Court do not provide an explanation for why the various resources she identified were rejected by the agency.
DECISION AND ANALYSIS
The statement of legislative findings and intent included in SSL Section 384-b states in pertinent part, "it is generally desirable for the child to remain with or be returned to the birth parent because the child's need for a normal family life will usually best be met in the home if its birth parent" and "the state's first obligation is to help the family with services to prevent its break-up or to reunite it." SSL Section 384-b(1)(a)(ii) and (iii). Parental rights may be terminated for permanent neglect, defined as, "a child who is in the care of an authorized agency and whose parent...has failed for a period of more than one year following the date such child came into the care of an authorized agency substantially and continuously or repeatedly to maintain contact with or plan for the future of the child, although physically and financially able to do so, notwithstanding the agency's diligent efforts to encourage and strengthen the parental relationship...." SSL Section 384-b(7)(a). The agency must meet its burden of proof both of permanent neglect and of the agency's own diligent efforts by clear and convincing evidence. FCA Section 622; Stantosky v. Kramer 455 U.S. 745 (1982). In assessing whether the agency has met its burden of clear and convincing evidence, it is important to remember that respondent was 16 when the subject child was removed from her care, and to view the requirements "although physically and financially able to do so" as well as the diligence of any efforts made by the agency "to encourage and strengthen the parental relationship" from that perspective.
 "When an authorized child-care agency has brought a proceeding to terminate parental rights, on the ground of permanent neglect, the Court must evaluate as a threshold matter whether the agency has exercised diligent efforts to encourage and strengthen the parental relationship." In the Matter of Sheila G. 61 N.Y. 2d 368, 380-381 (1984). The efforts made by Lutheran Social Services in the instant case fall far short of that goal.
In making this judgment, the Court must comment upon the quality of the evidence presented on the petitioner's case: the case record. A proper foundation was laid and the records were received into evidence. In re R. 264 A.D. 2d 423 (2nd Dept. 1999). In addition, the agency did provide respondent's counsel and the law guardian with copies of the case record prior to trial and counsel stipulated to redact certain hearsay from the documents. In re Leon RR 48 N.Y. 2d 117 (1979). However, in deciding what weight, if any, to give to that admissible evidence, the Court must address the deficiencies in that record. First of all, there are no records at all for the first year Starrtasia was in care. The Court must infer that no efforts at all were made to engage respondent in services so that she could plan for the future of her child for this significant period of time. The records received into evidence and covering the period from July 13, 2001 through October 30, 2002 are missing such substantial periods of time and contain such internal inconsistencies and inaccuracies from one report to another as to render them completely unreliable and unworthy of any credit. The Court does credit the agency's casework records from [*10]January 2001 through July 13, 2001.
Based upon those records, it appears that the agency's plan, upon receiving Starrtasia into its custody, was to work with the foster parent, the maternal grandmother of the child, to achieve permanency through her. The substantial portion of the records received into evidence and credited here by the Court, that is, the period between January 2001 and July 2001, reflected contact, communication and support being given to the maternal grandmother. Entries reflecting contacts and communication with the respondent mother were sparse and mostly in passing. Unfortunately, this agency plan ignored critical information the caseworker was diligently recording in her reports from January through June 2001: the maternal grandmother was adamantly opposed to parenting her daughter's children, and respondent alleged that her mother had been abusive to her for as long as she could remember. The maternal grandmother returned the subject child to the agency twice before the agency changed its plan. At that point, in September 2001, the agency changed the permanency plan from "return to parent" to "adoption." The case report in evidence reflects that this decision was made after a conversation with the maternal grandmother who asserted that respondent "was never going to plan for these children." There is no note in that report that respondent was consulted or notified of the change in plan. The fact that the agency may have decided that respondent was not a realistic resource for the subject child, and determined that they would work through her mother, and not through respondent, does not excuse the agency's statutorily mandated requirement to "strengthen the parental relationship" specifically between respondent and her child. Matter of Jamie M. 63 N.Y. 2d 388, 394 (1984); In re Jawan Y. 274 A.D. 2d 696 (3rd Dept. 2000). Lutheran Social Services had a mandated duty to work with respondent and provide "services and other assistance...so that problems preventing the discharge of the child from care may be resolved or ameliorated." SSL Section 384-b(7)(f)(3). They failed to do so.[FN4]
There was one referral for parenting skills, to NCNW. One referral is clearly not enough to show that the agency met its burden to show that respondent refused to cooperate with its plan for her. See generally In the Matter of Charmaine T. et. al. 173 A.D. 2d 625 (2d Dept. 1991). There was no follow-up with respondent to see why she failed to complete the program, to address whatever issues she might have had, perhaps to find a more convenient program. "An agency must always determine the particular problems facing a parent with respect to the return of his or her child and make affirmative, repeated, and meaningful efforts to assist the parent in overcoming these handicaps.[italics added]" In the Matter of Sheila G. supra at 385. Moreover, after the instant petition was filed, respondent completed a parenting skills class, showing that if the agency had exercised some effort, respondent probably would have completed a program earlier. The Court is considering that evidence of respondent's compliance, though post-filing, because, "[a]t the fact-finding hearing the court is obliged to consider [respondent's] conduct and commitment toward her child during the interim, if that conduct has substantially changed, as well as the efforts of the agency." In the Matter of Star Leslie W. 63 N.Y. 2d 136, 147 (1984). Thus, the agency failed to exercise diligent efforts in encouraging respondent to enroll in and [*11]complete parenting skills during the relevant time period.
It may well be that the appropriate referral for respondent, given her age and history, would have been to a mother-child placement. However, there is no evidence that such a referral was ever made. There is evidence that the agency referred respondent to Inwood House, but no evidence that Inwood House is a "mother-child" resource. This referral was made through the voluntary placement of the respondent by her mother, who was then also the subject child's foster parent, and, based upon respondent's credible testimony, Starrtasia was never placed with her at this program. Instead, respondent testified credibly that she was basically in a shelter setting, that she had confrontations with some of the other residents, and that she feared that if she remained, ACS would remand the child she was imminently due to have. In fact, when she left the facility, she was dilated three centimeters, and the undated ACS COI which covered the period April-May 2001 confirmed that ACS placed a "social hold ... on the baby that she was almost due to give birth to." The COI could not explain why respondent mother was permitted to leave the hospital with that child, but she was, and when the caseworker visited the mother at her residence on June 15, 2001 and observed that newborn, Moasia, in the respondent mother's care, Moasia remained in her care. Nowhere in the records in evidence is it explained whether permanency for Starrtasia at the residence the respondent mother shared with the father of Moasia was ever explored. More importantly, however, there is nothing in the agency records that shows that the agency sought another "mother-child" placement for respondent, ever encouraged her to return or meaningfully explored the reasons why she left. Thus the agency failed to show diligent efforts to assist respondent in planning for the return of her child. In the Matter of Charmaine T., supra; In the Matter of Sheila G., supra.
This is not a case where the respondent mother is addicted to drugs or alcohol, willfully abused or mistreated any of her children or is impaired to the degree that she cannot care for her children. To the contrary, she currently has two children in her care, and those two children apparently have been in her care from birth. Given how well known respondent mother is to ACS and the agency, it is inconceivable to the Court that if there were any issues of child neglect with respect to those two children, there would not be petitions before the Court with respect to them.
Moreover, petitioner has failed to establish that respondent abandoned the subject child. When the subject child was in non-kinship foster care, contact between the agency and the respondent mother, other than at the respondent mother's instance, does not exist. There is no correspondence setting up meetings, visits or conferences, no notes of home visits to respondent, no notes of telephone calls. Months go by with no case record at all. Though counsel for petitioner argued that the absence of such information showed that respondent was somehow unavailable, that argument lacks credibility. To establish that respondent abandoned the subject child, there must be some evidence that the agency contacted or attempted to contact her to let her know, once her child was no longer in kinship care, where that child was and how to contact and visit her. There is none. In fact, though the agency attempts to plead that respondent was out of contact with the child from February 2002 though October 2002, its own records belie that conclusion. The report from October 7, 2002, cancelling respondent's visit with her child, has a telephone number at which the caseworker successfully reached respondent. Respondent credibly testified that the agency knew how to contact her, and that when she moved she called [*12]Ms. Stover and Ms. Stover's supervisor to advise them how to reach her. The Court finds respondent's testimony credible that her efforts to visit when the subject child was in non-kinship care were frustrated by the agency. The agency's own records established how it frustrated respondent's efforts to visit her child in December 2001. The Court particularly found credible respondent's testimony concerning her efforts to visit with her children in July and August 2002. In contrast, the agency's record for that period is bare of information, but for one sentence in a UCR stating that respondent's last face-to-face meeting with her daughter was in August 2002, in stark contrast to multiple references saying that respondent had failed to visit from February through October.
It is difficult to reach any conclusion but that the agency placed hurdles in the way of the respondent mother regaining her child, but offered her no support or services in attempting to achieve those goals. Therefore the agency has failed to fulfill its statutory mandate, has failed to meet its burden of proof, and its petition to terminate respondent's parental rights is dismissed.
Jamaica, New York
December 2, 2003
Marybeth S. Richroath
J. F.C.
Decision Date: December 02, 2003
Footnotes

Footnote 1:For purposes of this application; she continues in care to the present.

Footnote 2:Much of the casework between January and April 2001 involved support being provided by the agency to the maternal grandmother. Casework notes document issues between respondent and this kinship resource. This removal occurred because the maternal grandmother believed she needed to "teach [respondent] a lesson." Respondent was pregnant with another child and due to give birth in April 2001. When respondent's pregnancy was confirmed, the maternal grandmother of the subject child gave the agency ten day's notice to remove the subject child from her care.

Footnote 3:The COI states that the agency and ACS "were unaware of BM's whereabouts" from April 6, 2001 until respondent came to Court on April 26, 2001. Efforts to locate respondent were not outlined in that report or in any of the other evidence before the Court, other than the statement in the COI, "the McCray family had denied BM's presence in their home repeatedly."

Footnote 4:Nor does the Law Guardian's plea for permanency on behalf of his client excuse the legislative requirement, of constitutional proportions, that the agency work diligently with respondent to re-unite the family.