Matter of Joshua S (2004 NY Slip Op 50894(U))

[*1]

Matter of Joshua S

2004 NY Slip Op 50894(U)

Decided on June 14, 2004

Family Court, Kings County

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on June 14, 2004

Family Court, Kings County
JOSHUA S, a child under the age of eighteen, alleged under SSL § 384-b subd. (7) (a), to be permanently neglected by the respondent, Leonard S
B 14106/03

Lee H. Elkins, J.
The Administration for Children's Services, the petitioner, alleges that the respondent father of the child Joshua [d.o.b. 6/19/00] permanently neglected him [SSL § 384-b [7][a]] by failing to visit consistently or to plan for his discharge from foster care. The matter was tried at inquest.[FN1] The issue is whether the evidence proves permanent neglect by the father.
Findings of fact
Based upon case records in evidence, it appears that in September 2001, the mother left the child Joshua, 15 months old, in the home of her mother. The maternal grandmother was the foster parent for the mother's older children by a different father. At the time the mother left Joshua, another of her children in the maternal grandmother's care was the subject of a separate Termination of Parental Rights [TPR] proceeding. The grandmother notified the agency that her daughter had left Joshua with her. Joshua was then placed into foster care, to live with the grandmother.
The court finds that although the grandmother knew Joshua's father's identity, and contacted him through his friends in early October 2001, the agency case worker made no effort to contact the child's father. The father was not invited to the 72 hour conference held on October 23, 2001. or to a Family Permanency Conference on November 15, 2001. The first mention of any effort to locate the father is November 30, 2001. Although the foster maternal grandmother denied any contact with either parent on December 7, the father appeared in court on December10, 2001. On that date, the court ordered that weekly visits be arranged between the father and child. The agency records reflect that the father worked as a construction worker in another borough. He would leave home early and return in the late afternoon. He lived in a four bedroom apartment, leased in another resident's name.
The worker scheduled the father's first visit for a date when the agency was closed. The father came to the agency only to find it closed. The foster mother failed to produce Joshua, saying he was sick. The case worker initially recorded that the father failed to appear, then corrected the entry. When the father arrived at the agency on December 27, he told the worker [*2]that he wanted the child, and also wanted his court ordered weekly visits. He expressly stated that he did not want to visit in the maternal grandmother's home, and gave a cogent reason. The father explained that he was concerned that he would be falsely accused of child neglect by the natural mother or the foster grandmother. He stated that the mother had reported him in the past, but that he was "cleared by Albany after an investigation," and was notified that the allegations were unsubstantiated. For that reason he preferred that the visits occur at the ACS field office. The case worker replied "that it would be difficult for the [foster mother] to carry the baby to the office for a visit in Winter time." The worker said she would speak to the foster mother. She in fact informed the foster mother that the visits were to occur at the agency on Wednesday evenings from 5 p.m. to 6 p.m.. The foster mother replied that since she would allow the father to visit in her home, the judge told her to do what was convenient for her. The case worker told the grandmother that she must comply with the court order.
The foster mother produced the child on January 9, 2002. The case worker noted that the child was "very young and could not remember" his father. The father explained that he had not seen Joshua since August, 2001. The foster mother complained that weekly visits were too burdensome and suggested that the visits be reduced to bi-weekly. In fact, she failed to produce Joshua the following two weeks. On each occasion the agency simply called the father to cancel the visit without offering to reschedule. On the first occasion she stated that the child was ill. On the second occasion she stated that she was ill. Three weeks after the first visit, the foster mother brought the child 25 minutes late for the visit on January 30. She left when the father did not arrive by 6:05. She asked the case worker whether her 19 year old foster son could bring the child. The foster mother explained that she worked "and it would be too tasking for her to try to bring the child in time for the visit." The case record reflects that the foster mother arrived home from work at 3:45 p.m.. There was no attempt by the case worker to schedule the visits at a more convenient time. The foster mother also expressed her "reservations about the visit. She indicated that during the first family visit, the bio father did not interact at all with Joshua."
Although the foster parent brought Joshua the following week, when the father called to say that he was running late the case worker ended the visit before he could arrive. On February 13, both the father and the foster mother appeared on time. The case worker noted that "although the father was pleased to see the child, his interaction with the child was poor. He did not hug or hold the child." The staff urged the father to interact with the child. On February 20, the case worker was on vacation. The father apparently left a message on her voice mail saying he would not be able to attend the visit. The supervisor called the father at 5:20 p.m. and found him at home. The father informed the supervisor that he had called the case worker and left a message. He stated that he was exhausted from work. The next week the supervisor noted that neither the foster parent or the father appeared. As far at the record shows that no visits occurred at all in March. There are no notes for two visits, and the foster mother cancelled two visits, one because of rain and another because she had a parent-teacher meeting for another foster child. There is no evidence that any visit was rescheduled by the worker.
[*3]
The next visit did not occur until April 10. The father called to say he was running late, and arrived at 5:20. Initially, when the respondent tried to hug Joshua, Joshua cried. When Joshua gave him a hug at the end of the visit, the case record notes that the respondent was "very pleased." The next two visits were cancelled. The first apparently was cancelled by mutual agreement. No effort was made to reschedule. The father learned that the second was cancelled from a security guard when he arrived for the visit.
On May 1, both the father and grandmother arrived on time. Joshua let his father hold him. The case worker cancelled the next visit, apparently with no effort to reschedule or obtain coverage for the visit. A visit occurred on time on May 15, 2002. The father brought a toy and cookies for Joshua. Joshua took his father's hand and let his father hold him. The father made attempts to communicate with Joshua and supervised him during the visit. The foster mother cancelled the visit the following week, saying that Joshua was sick. There is no note for May 29. All June visits apparently were cancelled, in part due to construction at the agency.
The father did not see Joshua again until July 10. At that time he brought Joshua "a nice big present, two games." The case worker observed that Joshua "did not have much reaction to his father because he did not see him for a [sic] several weeks." Nonetheless, the father tried to play the games with Joshua. The worker noted that the visit went well. On July 17, the foster mother cancelled the visit "because she had very high pressure." The father also could not make this visit. No effort was made to reschedule and no further case notes entries were made in July.
The next visit did not occur until August 28. The foster mother cancelled August 14, due to an agency meeting. There is no evidence of an effort to schedule visits for the first or third weeks of August. When the foster mother saw the father on August 28, she asked him why he did not talk to the mother when he saw her on Ocean Avenue. The father replied that he did not want to talk to the mother. The father tried to interact with Joshua, talking to him and watching him. The father called to cancel the visit scheduled for September 4, 2002. On September 10, the case worker went to the foster home to see Joshua. The foster mother said that Joshua was teething and consequently had "fever and diarrhea." She stated that she could not take him anywhere. The foster mother said that if the father wanted to see Joshua, he should come to the foster home. The case worker left a message for the father, cancelling the September 11 visit. The September 18 visit was similarly cancelled. Thereafter, the case worker began to require the father to confirm visits a day in advance. She cancelled the September 25 visit, even though the father called at 4:30 to say he was on his way, but running late.
On October 2, the case worker's supervisor determined that the case worker should leave a message for the father the day before the visit, asking him to call on the day of the visit. The supervisor noted that the case worker had a phone number both for the father and for his sister. On October 2, the foster mother did not produce Joshua because she had scheduled a parent- teacher conference. The case worker called the father to say that there would be no visit because the father failed to confirm. The next day, the father told the worker that he had not arrived in the vicinity of the agency until 5:30. The worker never informed the father that the foster mother [*4]had cancelled the visit. Instead of following the supervisor's direction to call the father the day before the visit, the case worker informed the father that he was to call the agency "a day in advance" to say whether he was coming to the visit. The reason given was that the foster mother did not want to spend $20 for a cab "if she did not know in advance that the [birth father] would come." The worker also rescheduled the visits for 5:30. The foster mother and father both agreed to the later time. The foster mother cancelled the next two visits. The first she cancelled because she hurt her leg. The second because it was raining. The record is silent as to October 23. The case worker cancelled the visit of October 30 because the father did not contact the case worker to confirm the visit, and the foster mother "did not want to spend money for car service."
The father arrived an hour early on November 6. He apparently left before the visit could be confirmed with the foster mother. The father called to cancel the visit of November 13. The case worker cancelled the November 20 visit because she had not heard from the father. The foster mother refused to bring the child on November 26, because she had to cook for Thanksgiving. Instead of reminding the foster mother of the court order, the case worker told her that it was nice of her to offer to have the father visit in her home on Thanksgiving. Again no effort was made to reschedule the visits. On December 3, 2002 the case worker called the father "to find out whether or not he would come to visit" the next day. According to the case worker, the father cancelled the visit because of very cold weather. There is no indication of any effort to schedule a visit on December 11. During a foster home visit on December 17, the foster mother told the case worker that "the [birth father] called her and cancelled the [next] day's visit because it was too cold." There is no evidence of any effort to confirm this information with the father. There are no case note entries for the balance of December 2002, or January 1 or 8, 2003. The entry for January 15 states that no office visit occurred because the father did not respond to the case worker's inquiry whether he was planning to come to the office visit scheduled for that date. There is no entry for January 22 or January 29. A January 30 case note entry states that the case worker called the father to discuss his intention to plan for Joshua, in light of his not having visits for several months.
Then on February 4, 2003, the case work supervisor, in spite of the court order that visits occur weekly, determined that visits would occur biweekly for two hours, which he deemed "easier and more convenient for all of the parties." The next day the case worker called the father to inform him that the goal for Joshua would be adoption, " mainly due to the fact that he had not seen Joshua for several months." For the first time, the case worker offered assistance to the father to obtain housing. When the father requested a visit with Joshua at the agency the next day, the case worker called the foster mother. The foster mother said it was too cold to go outside with the baby. Joshua was two years and eight months old at that point. The case worker called the father and "informed him that [foster mother] could not bring the [foster child] in that weather."
Although the father called days in advance to confirm and appeared the visit for February 19, the foster mother failed to produce the child. When the father expressed surprise and complained that while he was threatened with loss of his parental rights, the foster mother was [*5]not required to adhere to the schedule. The supervisor stated that the problem had always been that the foster parent would produce the child and the father would not appear or call to cancel the visits. Consequently, the supervisor declared, "We decided to have him give a few days notice of his intention to come to the visit so that the foster parent could be informed to bring the child in."
On February 26, 2003 the father arrived early for the visit. The father and case worker completed Family Unification Program documents to assist the father with housing. The father stated that he had not worked steadily in three months. When the child arrived, the case worker noted that "[t]he child is too young to remember his father after several months not seeing him, and did not pay any attention to him." The case worker "encouraged [birth father] to interact with his son." Ultimately, because the father was watching television, the case worker told the father that he needed parenting skills classes "to learn how to interact and take care of the young child." The case worker made a parenting skills referral for the father on March 3, 2003.
Conclusions of law
The threshold of proof in any permanent neglect proceeding is that the agency engage in diligent efforts designed to encourage and strengthen the parent/child relationship. Diligent efforts is defined by statute as "reasonable attempts by an authorized agency to assist, develop and encourage a meaningful relationship between the parent and child, including but not limited to: (1) consultation and cooperation with the parents in developing a plan for appropriate services to the child and his family; (2) making suitable arrangements for the parents to visit the child.... (3) provision of services and other assistance to the parents * * * so that problems preventing the discharge of the child from care may be resolved or ameliorated; [and] (4) informing the parents at appropriate intervals of the child's progress, development and health." [SSL § 384-b [7][f]] The required statutory standard of proof is by clear and convincing evidence of all elements of permanent neglect, including proof of diligent efforts. [Matter of Sheila G., 61 N.Y.2d 368, 384 [1984]]
The court finds that in this case, even drawing all inferences favorably to the petitioner, the agency failed to prove by clear and convincing evidence that it made reasonable attempts to assist, develop and encourage a meaningful relationship between the parent and child. The agency made no effort to contact the father before he appeared in court on December 10, 2001. The child had been in the care of the maternal grandmother for about three months. The court thereupon ordered that the father have weekly visits with his eighteen month old son. According to the court's order, there should have been 64 visits scheduled between that date and February 26, 2003. In that 14 month period, as Joshua turned from one to almost three years old, the father was able to see Joshua exactly 7 times [1/9, 2/13, 4/10, 5/1, 7/10, 8/28/02, 2/26/03]
The agency did not schedule the first visit until three weeks after the court order. The first visit did not occur until four weeks after the court order. There are no case note entries relating to 16 dates when visits should have occurred. [3/6, 3/27, 4/3, 5/29, 7/3, 7/24, 7/31, 8/7, 8/21, 12/11, [*6]12/24, 12/31/02, 1/1, 1/8, 1/22, 1/29/03] Excluding the visits not scheduled for the first month after the court's order, and the revised biweekly schedule set by the supervisor in February 2003, the case worker cancelled five visits, one for a court appearance, and four during office re-construction [5/8, 6/5, 6/12, 6/19, 6/26/02] The supervisor cancelled one visit. [2/12/03] Four visits were apparently cancelled by the father and foster parent by mutual agreement [2/27, 4/17, 7/17, 12/3], without being rescheduled by the agency. The foster mother cancelled or failed to produce the child for 15 visits. [1/16, 1/23, 3/13, 3/20, 4/24, 5/22, 8/14, 9/11, 9/18, 10/2, 10/9, 10/16, 11/26/02, 2/5, 2/19/03] Only one of these [2/19/03] was rescheduled, and that after the supervisor reduced the schedule to biweekly visits. The case worker cancelled two visits when the father called to say he was running late [2/6/02, 9/25/02]. The latter visit was cancelled even though the father called 30 minutes before the scheduled time, to say he was running late, and even though he had not been able to see Joshua in a month. The case worker cancelled three visits when the father failed to confirm. [10/30, 11/20/02, 1/30/03] The father cancelled six of the 64 scheduled visits. [2/20, 9/4, 11/13, 12/4, 12/18/02, 1/15/03] He arrived too late for one visit [1/30/02] and left after arriving early for one visit. [11/6/02] Consequently, careful review of the record shows that the father unilaterally cancelled or failed to confirm only 9 visits out of 64 over a fourteen month period.
The agency's approach to this case is summarized by the events of February 2003. Upon informing the father on February 4 that the agency would be seeking to terminate his parental rights for inconsistency in his visits, and in response to his request for a visit on the next day, which was a scheduled visiting day, the case worker stated that she would contact the foster maternal grandmother. The foster mother told the case worker that it was "too cold" to bring 32 month old Joshua outside. The case worker then called the father to say that there would be no visit. The agency unilaterally [FN2] reduced the frequency of the visits from once a week to every other week, a schedule favored by the foster mother from the beginning. Nonetheless, the foster mother failed to produce Joshua on February 19. When the father complained to the agency supervisor that the foster mother had not adhered to the schedule despite his confirming the visit, the supervisor told him that the problem was that he had a history of not appearing when the foster mother produced the child. The court finds that in fact the foster mother failed to produce the child 25% of the time, and the agency failed to document its efforts to schedule visits another 25% of the time. Of the remaining 32 possible visits, the agency failed to schedule the first four, cancelled four visits in June during office construction, and cancelled two visits for the convenience of the agency. There were only 22 remaining available dates for visits. Of these, the foster mother and father mutually cancelled four. The agency case worker cancelled two, after the father called to say he was coming. The father's opportunity to visit was therefore reduced to about 16 visits, or 25% of the visits required by the court's order to be scheduled. The agency failed to reschedule any of the cancelled visits.
[*7]
There is no evidence of any effort on the part of the agency to schedule visits for the father at major holidays or on Joshua's birthday. When the foster mother cancelled a holiday visit in order to cook for Thanksgiving, the agency commended her for inviting the father to dinner. While the court would view the case worker's support of a working relationship between the father and the foster parent as good social work in most instances, in this case the father had good reason to mistrust the foster mother. She failed to assist the agency to contact the father, after the child was placed with her as a foster parent. She pressed the father about acknowledging her daughter on the street. The father wanted no contact with the respondent mother. The agency completely disregarded his concerns about the mother's history of making false allegations against him to the State Central Registry. Finally, the grandmother repeatedly failed to bring Joshua for visits.
The agency routinely accepted such excuses from the foster mother as that it was too cold or raining too hard to bring the child to visit the father. The case worker also allowed the foster mother to schedule parent-teacher conferences on several visiting days. The foster mother even scheduled meetings with agency case workers regarding other foster children to conflict with the father's visits. Instead of seeking to enforce the court's order of weekly visits, the agency supervisor unilaterally reduced the schedule to alternate weeks. At the same time, the agency consistently noted that Joshua did not respond to his father during his infrequent visits, due to his young age and lack of memory of his father.
The record also shows that the father made efforts to respond to the case worker's suggestions that he try to interact more with Joshua during the limited opportunity he had to visit. In the spring of 2002, the father began to make progress with Joshua. Joshua let his father hug him, and took his father's hand. The father brought Joshua cookies, toys and games. He supervised Joshua during the visits. The father's efforts were undermined by the infrequency of his opportunity to visit. For example, after Joshua allowed his father to hug him at the end of the visit on April 10, the next two visits were cancelled without being rescheduled. The father learned that the second was cancelled from a security guard when he arrived for the visit. Nonetheless, on May 1, Joshua again let his father hold him. The case worker cancelled the next visit, due to her own court appearance with no effort to reschedule or obtain coverage for the visit. At a May 15 visit, the father brought a toy and cookies for Joshua. Joshua took his father's hand and let his father hold him. The father made attempts to communicate with Joshua and supervised him during the visit. The foster mother cancelled the visit the following week. May 29 was a holiday. All June visits apparently were cancelled, in part due to construction at the agency. The father did not see Joshua again until July 10. At that time he brought Joshua "a nice big present, two games." The case worker observed that Joshua "did not have much reaction to his father because he did not see him for a [sic] several weeks." Nonetheless, the father tried to play the games with Joshua. The worker noted that the visit went well. On July 17, the foster mother cancelled the visit "because she had very high pressure." No effort was made to reschedule and no further case notes entries were made in July. The next visit did not occur until August 28.
[*8]
In determining whether an agency's efforts are diligent, the court must look first to the statute. Beyond the statute, the court may look to accepted practices in the field of social work. The Court of Appeals noted in Matter of Sheila G., [supra, 61 N.Y.2d at p 388] that agencies have an obligation to make "suitable arrangements for the parents to visit the child" [Social Services Law § 384-b [7] [f][2]] The court observed in that case, that the child's visits with her father began "one hour every other week at 5:00 p.m. at [the agency] offices." The court noted further that the child's "caseworker was aware that [her father] worked until at least 5:00 p.m. and that for some visits, due to [his] working late and travel time, he was only able to visit for a short time." Nonetheless, "during this period, [the father's] relationship with [the child] had gone from a lack of friendship to one of friendship." The Court concluded that despite that evolution, "the caseworker never recommended that the frequency of visitation be increased or the timing of visits be changed or lengthened. This was admitted to be a bad policy and contrary to good social work rules."
Similarly, the court in this case cannot condone the agency's practice as diligent. [Accord, Matter of the Commitment of Guardianship and Custody of Starrtasia Ann, 2 Misc.3d 1003 [Fam. Ct. N.Y. Co. 2003]] The agency simply failed to provide the father with sufficient opportunity to encourage and strengthen the parent-child relationship. [Contrast, e.g., Matter of Daniel AA, 241 A.D.2d 703, 704 [3rd Dept. 1997] [suitable arrangements for visitation, which were constantly modified to meet the family's present needs and circumstances, were made in an attempt to reintegrate the children into the home.]; Matter of Jessica MM, 122 A.D.2d 462 [3rd Dept. 1986] [visits with an infant twice a week at scheduled times at her foster home, during which parents were "to follow the suggestions of the foster mother on ways to interact with the infant."]]
Nor did the agency otherwise engage with the father to address the problems preventing him from caring for Joshua. The father was employed. The agency advances no argument that the father was unfit or unable to care for Joshua, apart from issues with appropriate housing and child care. The agency did not offer the father assistance with housing until Joshua had been in care for 18 months. The agency only referred the father for parenting skills after he became discouraged in his efforts to engage Joshua during the intermittent visits. The agency obviously was content to allow Joshua to remain in the care of his maternal grandmother, and made no meaningful efforts to assist the father to be able to care for him.
 "[T]he Legislature has charged child-care agencies with a specific obligation to assist parents in regaining custody of children committed to foster care. It has recognized that the degree to which a parent has upheld his or her obligations to such children cannot be meaningfully measured when the agency itself has not undertaken diligent efforts on behalf of reuniting parent and child." [Matter of Sheila G., supra, 61 N.Y.2d at p 385] Consequently, the agency having failed to meet it's threshold burden to show that it employed diligent efforts, the petition alleging permanent neglect is dismissed without considering whether the father meaningfully engaged in planning for the return of the child.
[*9]
The matter is adjourned for a hearing pursuant to Family Court Act section 632, to determine the best interests of the child. The foregoing constitutes the opinion, decision and order of the court.
June 14, 2004____________________________________
Lee H. Elkins, JFC
Footnotes

Footnote 1: The evidence clearly and convincingly proves that the mother abandoned the child. 

Footnote 2: The policy of the Administration for Children's Services, expressed in the Family Visiting Resource Guidelines [rev. April 2002] explicitly advises that where there is a court order regarding the frequency of parent child visits, agencies should return to court to modify the existing court order before decreasing the frequency or otherwise limiting the visiting plan.