Matter of Willow K. (Victoria L.) (2023 NY Slip Op 03730)

Matter of Willow K. (Victoria L.)

2023 NY Slip Op 03730

Decided on July 6, 2023

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:July 6, 2023

534330
[*1]In the Matter of Willow K., Alleged to be a Permanently Neglected Child. Chemung County Department of Social Services, Respondent; Victoria L., Appellant.

Calendar Date:June 7, 2023

Before:Lynch, J.P., Clark, Pritzker, Reynolds Fitzgerald and Fisher, JJ.

Pamela B. Bleiwas, Ithaca, for appellant.
M. Hyder Hussain, County Attorney, Elmira (Mark H. Smith of counsel), for respondent.
Lisa K. Miller, McGraw, attorney for the child.

Lynch, J.P.
Appeal from an order of the Family Court of Chemung County (Mary M. Tarantelli, J.), entered September 29, 2021, which granted petitioner's application, in a proceeding pursuant to Social Services Law § 384-b, to adjudicate the subject child to be permanently neglected, and terminated respondent's parental rights.
Respondent is the mother of the subject child, who was removed from respondent's care upon her birth in October 2018 and placed in a kinship foster home with respondent's adoptive mother (hereinafter the grandmother) and older half sibling (hereinafter the older child; born in 2016). Pertinent in that regard, a neglect case against respondent regarding the older child had been terminated in March 2018 in conjunction with an order awarding custody of the older child to the grandmother on consent of the parties (see Family Ct Act § 1055-b). The older child has visitation with respondent pursuant to this arrangement. In April 2019, respondent consented to a neglect finding with respect to the subject child and a one-year order of supervision was entered upon various terms and conditions.
Petitioner commenced this permanent neglect proceeding seeking to terminate respondent's parental rights just 10 months after entry of the April 2019 consent order (see Social Services Law § 384-b [7] [a]).[FN1] The petition alleged, among other things, that despite petitioner's attempts to provide respondent with preventative services tailored to ameliorate the issues leading to removal, she had not been fully compliant, had severe unresolved mental health issues, had missed several visits with the child, and had unstable housing. Following a fact-finding hearing, Family Court adjudged the child permanently neglected, finding that respondent failed to properly plan for the child's future despite petitioner's diligent efforts toward reunification.[FN2] After a dispositional hearing, respondent's parental rights were terminated and the child was freed for adoption. Respondent appeals.
Respondent — joined by the attorney for the child (hereinafter AFC) — argues that petitioner did not prove by clear and convincing evidence that it made diligent efforts to encourage and strengthen the parental relationship. To that end, " '[a] permanently neglected child is one who is in the care of an authorized agency and whose parent has failed, for at least one year after the child came into the agency's care, to substantially and continuously or repeatedly plan for the future of the child, although physically and financially able to do so, notwithstanding the agency's diligent efforts to encourage and strengthen the parental relationship' " (Matter of Issac Q. [Kimberly R.], 212 AD3d 1049, 1050 [3d Dept 2023], lv denied 39 NY3d 913 [2023], quoting Matter of Leon YY. [Christopher ZZ.], 206 AD3d 1093, 1094 [3d Dept 2022]; accord Social Services Law § 384-b [7] [a]). The threshold inquiry in a proceeding to terminate parental rights on the ground of permanent neglect is whether [*2]the petitioning agency made diligent efforts toward reunification (see Matter of Rhiannon D. [Dari L.], 215 AD3d 964, 965 [2d Dept 2023]) — meaning "reasonable attempts . . . to assist, develop and encourage a meaningful relationship between the parent and child" (Social Services Law § 384-b [7] [f]).
The petitioning agency "bears the burden of proving . . . that such diligent efforts were made," and must do so by clear and convincing evidence (Matter of Issac Q. [Kimberly R.], 212 AD3d at 1051; see Matter of Jase M. [Holly N.], 190 AD3d 1238, 1240 [3d Dept 2021], lvs denied 37 NY3d 901 [2021]). To satisfy that burden, the agency "must develop a plan that is realistic and tailored to fit [the] respondent's individual situation" (Matter of Jesus JJ., 232 AD2d 752, 753 [3d Dept 1996], lv denied 89 NY2d 809 [1997]; see Matter of Sheila G., 61 NY2d 368, 385 [1984]), and "make affirmative, repeated, and meaningful efforts to assist the parent in overcoming these handicaps" (Matter of Sheila G., 61 NY2d at 385). The petitioning agency "should mold its diligent efforts to fit the individual circumstances so as to allow the parent to provide for the child's future' " (Matter of Austin A., 243 AD2d 895, 897 [3d Dept 1997] [internal quotation marks and citation omitted]).
Pertinent here, the April 2019 "terms and conditions" placed upon respondent required, among other things, that she "undergo a complete mental health evaluation by a licensed professional approved by [petitioner]"; engage in a domestic violence program; attend all of the child's medical appointments and all scheduled visitation; and "successfully complete Family Services of Chemung County's Protective Parenting Program." We agree with respondent and the AFC that petitioner did not prove, by clear and convincing evidence, that it made diligent efforts to assist respondent in satisfying these conditions.
At the outset, we recognize that petitioner did make some efforts which, under different circumstances, might be considered "diligent" within the meaning of Social Services Law § 384-b (7) (f). The problem here, however, is that they were not sufficiently tailored to respondent's particular needs. The core issue in this case concerns respondent's mental health, which includes longstanding behavioral disorders as well as a cognitive disability due to a traumatic brain injury she suffered as a child. The record does establish that respondent received mental health counseling throughout the period preceding commencement of this permanent neglect proceeding, but petitioner failed, as a threshold matter, to have a "complete mental health evaluation" performed as directed by the terms and conditions. Instead, petitioner relied on a piecemeal approach that was not appropriate for respondent's circumstances. To that end, respondent received services from a mental health therapist between July 2018 and August 2019; a licensed master social worker (hereinafter LMSW) between October 2019 and February [*3]2020; and a licensed clinical social worker (hereinafter LCSW) who began counseling respondent in March 2020. Unfortunately, there was a lack of consensus among these providers as to respondent's mental health diagnoses, as well as conflicting evidence about the extent of her cognitive disability. Although these providers were aware of respondent's disability, the mental health therapist characterized it as "mild" based upon a "report . . . on her file." Other evidence — including the fact that respondent has worked with Adult Protective Services (hereinafter APS) since she was 18 years old,[FN3] has a representative payee, and was a recipient of Supplemental Security Income benefits — calls this characterization into question. In addition, the grandmother revealed that respondent has a "pervasive developmental disorder," which was explained as a "combination of autism spectrum disorder and intermittent explosive disorder." The point made is that there was conflicting evidence about the extent of respondent's cognitive disability, yet no evidence that petitioner took proactive steps to ascertain the severity of it and to determine whether her service providers were equipped to provide the level of care she needed (see generally Matter of Xavier Blade Lee Billy Joe S. [Josefina S.], 187 AD3d 659, 660 [1st Dept 2020]).
Particularly concerning is the LMSW's testimony that, upon referral, he was not provided with "any type of a diagnosis," explaining that respondent "presented by herself." He further explained that, after working with respondent, he ultimately diagnosed her with "complex post traumatic stress disorder" (hereinafter CPTSD) — also commonly referred to as borderline personality disorder — and that his services "were trauma focused, primarily anger management services." Although counseling with the LMSW ended shortly after a December 17, 2019 volatile session involving respondent and the caseworker, he did testify that respondent was aware of her limitations and "motivated to have her CPTSD addressed. She understood all of her symptoms." The LCSW, who had a different understanding of respondent's diagnoses, was also focused on anger management issues, and explained that, due to limited virtual sessions necessitated by the COVID-19 pandemic, respondent had yet to reach a point of "consistent stabilization" but was able to "use coping skills and calm herself back down." She further noted that she could focus on "individual cognitive behavioral issues" with respondent, but that respondent required further treatment that would have to be provided by others. In effect, the record reveals that respondent was cognizant of her behavioral issues and that, even with the piecemeal approach utilized, she was making progress. Had petitioner initiated a full mental health evaluation up front to determine the precise nature of respondent's mental health diagnoses and the severity of her cognitive disability, she may well have made further progress by the [*4]time of the hearing. That is particularly so given that respondent obtained secure housing by July 2019 and began a stable relationship with an individual whom she married in April 2021.
As for other efforts made in this case, the caseworker confirmed that the case plan utilized was "substantially similar or the same as the terms and conditions for the [older] child," yet there was no evidence that petitioner took any steps to reassess the appropriateness of such plan following the subject child's birth. With respect to visitation, petitioner at one point referred respondent to an organization called Pathways, Inc. to facilitate supervised visitation. However, there is evidence in the record that, between January 2021 and June 2021, respondent's visits — which were supposed to occur twice per week — were frequently canceled by the visitation coach through no fault of respondent, including a visit that was supposed to occur on respondent's wedding day. The record also contains evidence demonstrating that, during this time frame, the visitation coach was quick to deem respondent's visits forfeited if she did not confirm them within a strict 6:00 p.m. to 6:00 a.m. timeframe, including on one occasion when respondent confirmed her visit at 4:41 p.m. the day prior and then confirmed her visit again at 6:58 a.m. that morning. We also note that, when one of respondent's visitation coaches was asked whether she had engaged in "any discussion or any thought process [about] how to teach [parenting] skills [to respondent] in a way . . . [that she] [w]as able to understand given her disabilities," the visitation coach confirmed that she had not, explaining that she speaks to respondent "like [she] would speak to anybody" else. This is yet another example of petitioner's failure to take proactive steps to ensure that the service providers respondent was working with were equipped to handle her unique needs.
Petitioner also did not exercise diligent efforts to provide respondent with appropriate housing services. In that respect, the record does confirm that respondent was referred by APS to a facility called Bragg Towers — a complex for people with disabilities — in or around July 2019 and that she moved into a one-bedroom apartment there. However, Bragg Towers did not allow children to reside there and when respondent told her caseworker that she wanted to obtain alternative housing where her children could also reside, the caseworker did not make any efforts to assist her in this regard, instead taking the position that respondent was not "at the point where the children were going to return home."
The efforts made to enable respondent to participate in a protective parenting course offered by Family Services of Chemung County, as required by her terms and conditions, were similarly inadequate. It is clear from the record that one of the primary concerns regarding respondent's ability to care for the subject child was her ability to control her anger. [*5]Petitioner's initial caseworker made clear during the fact-finding hearing that completing a protective parenting program was crucial to enable respondent to gain necessary anger management skills, and that the caseworker expected the course to be completed at Family Services. Nevertheless, Family Services refused to accept respondent into the program and the caseworker did not refer her to an alternative program at that time, blaming her failure to do so on the fact that she "[could not] get that far because [respondent] was so angry at [her] all the time." That same caseworker, who left her employment in January 2020, testified that "we didn't get a chance to make the plan." As a result, respondent was unable to complete a key anger management program because the provider linked in the "terms and conditions" refused to allow her to participate. Compounding the problem, petitioner failed to implement an alternative plan through January 2020, but then filed the permanent neglect proceeding the next month. Such efforts cannot be characterized as diligent.
On this record, we conclude that petitioner did not satisfy its burden of proving, by clear and convincing evidence, that it made diligent efforts toward reunification that were sufficiently tailored to respondent's circumstances (see Matter of Xavier Blade Lee Billy Joe S. [Josefina S.], 187 AD3d at 660; Matter of Olivia L., 41 AD3d 1226, 1227 [4th Dept 2007]; Matter of Austin A., 243 AD2d at 898). Accordingly, the permanent neglect finding must be reversed and the matter remitted for further proceedings. On remittal, we encourage the parties to address the disparity between the subject child's case and the older child's case. It is difficult to comprehend why petitioner has not attempted to facilitate for the subject child the same Family Ct Act article 6 custody agreement that is in place for the older child, pursuant to which the older child has visitation with respondent. The failure to do so has created an untenable situation where the two children, who are bonded and live with the same custodian, are treated differently on essentially the same facts.
Clark, Pritzker, Reynolds Fitzgerald and Fisher, JJ., concur.
ORDERED that the order is reversed, without costs, and matter remitted to the Family Court of Chemung County for further proceedings not inconsistent with this Court's decision.

Footnotes

Footnote 1: The subject child's father had surrendered his parental rights by that time.
Footnote 2: We note that a section of the fact-finding order — which concludes that respondent failed to plan for the subject child's future — refers to three children who are not the subject of this proceeding.

Footnote 3: Respondent's APS caseworker noted that he had "never read a formal report" on respondent's disability.