Matter of Jonah M. (Davion D.) (2026 NY Slip Op 01905)

Matter of Jonah M. (Davion D.)

2026 NY Slip Op 01905

Decided on March 27, 2026

Appellate Division, Fourth Department

Published by New York State Law Reporting
Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to
revision before publication in the Official Reports.

Decided on March 27, 2026
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Fourth Judicial Department

PRESENT: CURRAN, J.P., BANNISTER, NOWAK, DELCONTE, AND
HANNAH, JJ.

960 CAF 24-01021

[*1]IN THE MATTER OF JONAH M. ONONDAGA
COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,
PETITIONER-RESPONDENT;
andDAVION D., RESPONDENT-APPELLANT.

THOMAS L. PELYCH, HORNELL, FOR RESPONDENT-APPELLANT.
ROBERT A. DURR, COUNTY ATTORNEY, SYRACUSE (LISA S. CUOMO OF
COUNSEL), FOR PETITIONER-RESPONDENT.
STEPHANIE N. DAVIS, OSWEGO, ATTORNEY FOR THE CHILD. 

 Appeal from an order of the Family Court, Onondaga County (Christina F.
DeJoseph, J.), entered July 1, 2024, in a proceeding pursuant to Social Services Law
§ 384-b. The order, inter alia, terminated the parental rights of respondent with
respect to the subject child. 
It is hereby ORDERED that the order so appealed from is affirmed without
costs.
Memorandum: In this proceeding pursuant to Social Services Law § 384-b, respondent father appeals from an order that, inter alia, terminated his
parental rights with respect to the subject child on the ground of permanent neglect and
freed the child for adoption. We affirm.
Contrary to the father's contention, we conclude that petitioner established by clear
and convincing evidence that it made diligent efforts to encourage and strengthen the
relationship between the father and the child (see Social Services Law §
384-b [7] [a]; Matter of Kemari
W. [Jessica J.], 153 AD3d 1667, 1667-1668 [4th Dept 2017], lv denied
30 NY3d 909 [2018]). A permanently neglected child means, in relevant part, "a child
who is in the care of an authorized agency and whose parent or custodian has failed for a
period of . . . at least one year or [15] out of the most recent [22] months following the
date such child came into the care of an authorized agency . . . [to] plan for the future of
the child, although physically and financially able to do so, notwithstanding the agency's
diligent efforts to encourage and strengthen the parental relationship" (§ 384—b [7] [a]; see Matter of K.Y.Z. [W.Z.], — NY3d
—, —, 2025 NY Slip Op 05781, *5 [2025]). "Thus, in a permanent neglect
proceeding, the petitioner bears the burden of proving by clear and convincing evidence,
first, that it made such diligent efforts, and, second, that the respondent failed to plan for
the child's future" (Matter of
Jack V. [Jack U.], 243 AD3d 1174, 1176 [3d Dept 2025] [internal quotation
marks omitted]; see Social Services Law § 384—b [7] [a];
K.Y.Z., — NY3d at —, 2025 NY Slip Op 05781, *5).
" '[D]iligent efforts' . . . mean[s] reasonable attempts . . . to assist, develop
and encourage a meaningful relationship between the parent and the child" (Social
Services Law § 384-b [7] [f] [emphasis added]), and they " 'include reasonable
attempts at providing counseling, scheduling regular visitation with the child[ ], providing
services to the parent[ ] to overcome problems that prevent the discharge of the child[ ]
into [the parent's] care, and informing the parent[ ] of [the child's] progress' " (Matter of Whytnei B. [Jeffrey
B.], 77 AD3d 1340, 1341 [4th Dept 2010]; see Matter of Caidence M. [Francis W.M.], 162 AD3d
1539, 1539 [4th Dept 2018], lv denied 32 NY3d 905 [2018]). "Petitioner is
not required, however, to guarantee that the parent succeed in overcoming [the parent's]
predicaments . . . but, rather, the parent must assume a measure of initiative and
responsibility" (Whytnei B., 77 AD3d at 1341 [internal quotation marks
omitted]). "While an agency's obligation to exercise diligent efforts is not obviated by a
parent's [*2]incarceration . . . , it does create[ ] some
impediments, both to the agency and to the parent, leading courts to conclude that diligent
efforts in such circumstances may be established by the agency apprising the incarcerated
parent of the child's well-being, developing an appropriate service plan, investigating
possible placement of the child with relatives suggested by the parent, responding to the
parent's inquiries and facilitating telephone contact between the parent and child"
(Caidence M., 162 AD3d at 1539 [internal quotation marks omitted]; see
§ 384-b [7] [f]; Matter
of Callie H. [Taleena W.], 170 AD3d 1612, 1613 [4th Dept 2019], lv
denied 35 NY3d 905 [2020]).
Here, the record establishes that the father was incarcerated at the time petitioner
learned of his paternity and he remained incarcerated for approximately six months
thereafter. At the fact-finding hearing, the first caseworker assigned to the father's case
testified that she contacted the correctional facility where the father was housed to
determine the process for the father to have visitations with the child. While the father
faults the caseworker for the lack of visitation with the child during the time that he was
incarcerated, the inability of the father to meet with the child was due primarily to the
father's behavior while incarcerated, resulting in his placement in the special housing unit,
which had significant restrictions on visitations (see generally Matter of
Ty'Keith R., 45 AD3d 1397, 1397 [4th Dept 2007], lv denied 10
NY3d 701 [2008]). Additionally, the case file submitted into evidence by petitioner at the
fact-finding hearing establishes that a caseworker repeatedly inquired with the
correctional facility about opportunities for the child to visit the father, attempted to
locate family members who were willing to facilitate the visitations, and sought a court
order seeking video/telephone visits. While the father was incarcerated, caseworkers
responded to the father's inquiries about the child and, upon his transfer from the special
housing unit to the general population of the correctional facility, caseworkers
successfully set up a telephone visit for the father and the child, with the assistance of the
father's correctional facility counselor. The record also demonstrates that petitioner
developed a service plan for the father, which included substance abuse counseling,
mental health counseling, parenting classes and anger management classes, none of which
the father fully completed. The caseworkers assigned to the father's case sent monthly
letters to him, with the exception of two months, updating him on the child's well-being
and outlining petitioner's expectations regarding the service plan and informing him of
court dates.
After the father's release from prison, a caseworker provided the father with
information about services as well as a bus pass to facilitate the completion of some of
the counseling requirements, which the father declined to use. The caseworker also
arranged for biweekly in-person visitations with the father and the child. After he was
released from prison, however, the father violated the terms of his parole, resulting in at
least one reincarceration. Thus, we conclude that the record establishes, by clear and
convincing evidence, that petitioner made affirmative, repeated and meaningful efforts to
strengthen and encourage the parental relationship, and there is no basis to disturb Family
Court's finding that the threshold diligent efforts requirement was satisfied (see Matter of Jaxon S. [Jason
S.], 170 AD3d 1687, 1688-1689 [4th Dept 2019]; see generally Matter of Hailey ZZ.
[Ricky ZZ.], 19 NY3d 422, 429 [2012]).
We further conclude that, contrary to the father's contention, given the need for
permanency and the father's lack of a realistic solution for the child's future, the court's
determination that it was in the child's best interests to terminate the father's parental
rights and to free the child for adoption has a sound and substantial basis in the record (see Matter of Jemma M. [Ashley
M.], 237 AD3d 1569, 1570 [4th Dept 2025], lv denied 44 NY3d 908
[2025]). To the extent the father contends that he should have been awarded a suspended
judgment, we conclude that one is not warranted under the circumstances of this case,
including, inter alia, the fact that, at the time of the dispositional hearing, the father had
been reincarcerated (see Matter
of Aubree R. [Natasha B.], 217 AD3d 1565, 1567 [4th Dept 2023], lv
denied 40 NY3d 905 [2023]).
All concur except Nowak and Hannah, JJ., who dissent and vote
to reverse in accordance with the following memorandum: We disagree with the
majority's conclusion that petitioner established that it made diligent efforts to encourage
and strengthen the relationship between respondent father and the subject child. Thus, we
respectfully dissent.
In late February 2021, a neglect petition was filed in a separate proceeding against the
nonparty mother with respect to the subject child and his half-sibling; that same day, both
children were placed in the temporary care of the maternal grandmother. At the time of
the [*3]initial neglect petition against the mother, the
father had never met the child and was incarcerated. Nonetheless, in April
2021—while he was still incarcerated, and during the pendency of the neglect
proceeding against the mother—the father filed a petition seeking an order of
filiation, which was granted in December 2021 following an inquest. The father also filed
a petition seeking visitation and video calls with the child; at some point, the father was
made a party to the neglect proceeding against the mother as a non-respondent
parent.
In March 2022, Family Court issued an order in the separate proceeding finding that
the mother neglected the subject child. At the time the order of neglect was issued, the
father remained incarcerated and had never met the child. One year later—in
March 2023—petitioner filed the instant petition seeking to terminate the father's
newly-obtained parental rights, alleging that the father failed to plan for the care of the
child for the period of February 1, 2022 through February 28, 2023. The father was
incarcerated at two different facilities for the majority of that time, from February through
December of 2022. Petitioner does not contend—either in the proceedings in
Family Court or now on appeal—that the father failed on more than one occasion
while he was incarcerated to cooperate with petitioner's efforts to plan and arrange visits
with the child and that petitioner was therefore not required to engage in diligent efforts
(see Social Services Law § 384-b [7] [e] [ii]), and the court made no such
finding in the order on appeal. Petitioner thus had the burden to establish, by clear and
convincing evidence, that it made diligent efforts to encourage and strengthen the parental
relationship between the father and the child during that time period (see §
384-b [7] [a]).
That is "a demanding standard . . . for good reason. Every parent has a constitutional
right to the care and custody of their child—an interest 'far more precious than any
property'—and any lesser standard risks erroneous termination and irreparable
damage to the family" (Matter of K.Y.Z. [W.Z], — NY3d —,
—, 2025 NY Slip Op 05781, *9 [2025], quoting Santosky v Kramer, 455
US 745, 758-759 [1982]). In our view, the evidence adduced by petitioner established not
only that its efforts were minimal and perfunctory, but that it actively inhibited the father's
relationship with the subject child, rather than encouraging and fostering that relationship
as required.
Indeed, we disagree with the majority's conclusion that petitioner appropriately
responded to the father's inquiries while he was incarcerated. During that time,
petitioner's efforts to encourage and strengthen the parental relationship effectively
consisted of sending the father nearly identical form letters approximately once a month,
though there were several months where the caseworker simply neglected to send a letter
because she was too busy. The form letters hardly served to foster the father's relationship
with the child; in fact, they primarily set forth the services required for the nonparty
mother following the finding in the separate proceeding that she neglected the child.
In point of fact, none of the letters sent to the father in prison directed him to
participate in any services that may have been offered at the facilities, nor could they
have—the caseworker admitted on cross-examination that she never checked what
services, if any, were available to the father in prison. Rather, the letters merely advised
the father, as a non-respondent parent, of the services petitioner "will be expecting [him]
to enroll in upon [his] release from prison."
Of the letters that the caseworker did not forget to send, one was written to an entirely
different person regarding that person's child, another requested that the father stop
attempting to contact the caseworker, and another was written for the father but referred
to a different child entirely. In fact, these form letters indicate that, as early as September
2022 and essentially every month thereafter, petitioner was not seeking to reunify the
father with the child but, rather, was preparing to terminate the father's parental
rights.
Other than sending the father form letters, petitioner's caseworkers did little else to
encourage and strengthen the parental relationship between the father and the child.
Petitioner facilitated only one brief phone call with the child over the span of the father's
incarceration. After that single phone call, the father's counselor at Cayuga Correctional
Facility repeatedly asked the father's caseworker—an employee of
petitioner—to "please send in the request for visitation . . . on [petitioner's]
letterhead" in order to allow the father to have in-person visitation with his child on
weekdays during the caseworker's regular work hours. The caseworker never prepared the
necessary letter, and the father was never able to obtain in-person visitation during [*4]his incarceration.
In August 2022, the court directed that the father receive "bi-monthly phone/video
contact" with the child for the remaining four months of his incarceration. Petitioner
failed to set up those calls, either by phone or video, blaming the father's counsel, who
was representing him in conjunction with his petition seeking visitation with the child, for
failing to draft a court order consistent with the court's direction. The
caseworker's testimony while being cross-examined by the father's attorney speaks
volumes:
"Q: [W]hen the information from the attorney wasn't forthcoming, what did you
 do about this?
A: I waited for that to be submitted. . . .
Q: And you never made any efforts to obtain the information, would that be
 fair to say?
A: It wasn't ordered for the [petitioner] to submit that information.
Q: All I'm asking for ma'am, is whether you in fact made that effort or
 not?
A: No, I did not . . .
Q: . . . Did you ever discuss my client not having visits with any supervisor in
 the department?
A: We debriefed about the situation, what had to happen in order for
 visits.
Q: Okay. And what was your plan for that, ma'am?
A: I was directed to — that his counsel had to submit the order to the
 facility.
Q: Okay?
A: For visits to be set up and it had not happened at that point.
Q: And what did you do with regard to the directions you were given in that
 regard?
A: Waited.
Q: You just waited."
Consistent with the caseworker's testimony, petitioner continued to simply wait for
the father's attorney to draft an order, despite its caseworker's note in September 2022 that
Cayuga Correctional Facility permitted one phone call per month without an order. As a
result, the father had no contact whatsoever with his child from August of 2022 until he
was released from incarceration in mid-December 2022.
Thus, petitioner's efforts to encourage and strengthen the parental relationship did not
begin until after the father's release from prison, over 10 months into the relevant time
period. When petitioner finally attempted to assist the father, he did not reject those
efforts; in fact, he had 12 visits with his child, and asked for more visits in addition to the
visits that petitioner was providing. Petitioner's caseworker testified that the father
"brought toys for [the child and] tried to connect," and even when visits had to be
rescheduled due to petitioner's error, the father "showed up to all of those visits."
Petitioner confirmed with the father's parole officer that the father completed a substance
abuse evaluation, and therefore the father did not need to separately complete substance
abuse classes as petitioner requested. The father also completed intake, orientation, and
three classes in domestic violence counseling.
While the father did not complete the domestic violence program or anger
management classes by the end of the period at issue in February 2023, "the degree to
which a parent has upheld his or her obligations to such children cannot be meaningfully
measured when the agency itself has not undertaken diligent efforts on behalf of reuniting
parent and child" (Matter of Sheila G., 61 NY2d 368, 385 [1984]). "A child
services agency has the burden to submit sufficient proof on the record that, if credited,
demonstrates under the applicable clear and convincing evidence standard that it made
'affirmative, repeated, and meaningful efforts to assist the parent in overcoming
[particular obstacles]' to reunification" (K.Y.Z., — NY3d at —, 2025
NY Slip Op 05781 at *2, quoting Sheila G., 61 NY2d at 385). Here, the record
shows that petitioner failed to make the required diligent efforts from February 1, 2022 to
December 9, 2022—for most of the time period at issue—and actually
frustrated the father's ability to meaningfully connect with his child during that time.
In short, the evidence adduced by petitioner established little more than that it
performed minimal, perfunctory, and generic acts aimed more toward ensuring that the
father's parental rights were terminated—as evidenced by petitioner's six letters
essentially admitting as much—than ensuring that the father could meaningfully
reunite with the child. Therefore, we [*5]would reverse
the order and dismiss the petition. If the minimal efforts taken here are sufficient, we struggle to
see what efforts would not be.
Entered: March 27, 2026
Ann Dillon Flynn
Clerk of the Court